838 F.2d 268
 56 USLW 2425, 1988-1 Trade Cases 67,871
 CITY OF MT. PLEASANT, IOWA, Appellant,
v.
ASSOCIATED ELECTRIC COOPERATIVE, INC.; Central Electric
Power Cooperative; Northeast Missouri Electric Power
Cooperative; Tri-County Electric Cooperative Association;
Macon Electric Cooperative; and Ralls County Electric
Cooperative, Appellees.
CITY OF MT. PLEASANT, IOWA, Appellee,
v.
ASSOCIATED ELECTRIC COOPERATIVE, INC.; Central Electric
Power Cooperative; Northeast Missouri Electric Power
Cooperative; Tri-County Electric Cooperative Association;
Macon Electric Cooperative; and Ralls County Electric
Cooperative, Appellants.
 Nos. 87-1471, 87-1603.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Oct. 12, 1987.
Decided Jan. 29, 1988.
Rehearing and Rehearing En Banc Denied in No. 87-1471 April 1, 1988.
 
 Charles F. Wheatley, Jr., Annapolis, Md., for appellant.
 W. Stanley Walch, St. Louis, Mo., for appellees.
 Before ARNOLD, Circuit Judge, HENLEY, Senior Circuit Judge, and BOWMAN, Circuit Judge.
 ARNOLD, Circuit Judge.
 
 
 1
 This antitrust case comes to us on appeal from a summary judgment entered in favor of defendants. Plaintiff, the City of Mount Pleasant, Iowa,[1] alleges that defendants, a group of related corporations which comprise part of a rural electric cooperative, violated Sections 1 and 2 of the Sherman Act, 15 U.S.C. Secs. 1-2, and Section 2(a) of the Clayton Act, as amended by the Robinson-Patman Price Discrimination Act, 15 U.S.C. Sec. 13(a). The City's legal theories are that defendants participated in a price-squeeze conspiracy, monopolized the relevant market for wholesale electricity, monopolized the market for transporting electricity into Mount Pleasant from outside sources, and charged the City higher prices for wholesale electricity than they charged their own retail-distribution cooperatives. The District Court[2] granted summary judgment on the conspiracy claim on the basis of Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), holding that defendants are part of a single enterprise and therefore cannot conspire among themselves within the meaning of the Sherman Act. On the price-discrimination claim, the Court ruled that the cooperatives cannot make "sales" among themselves for purposes of the Robinson-Patman Act, relying on Security Tire & Rubber Co. v. Gates Rubber Co., 598 F.2d 962 (5th Cir.1979), cert. denied, 444 U.S. 942, 100 S.Ct. 298, 62 L.Ed.2d 309 (1979). On the two monopoly claims, the Court held that the City could not, as a matter of law, prove that defendants monopolized the market for wholesale electricity because it admitted that, whenever its wholesale-supply contracts expired, it requested bids from three utilities other than the cooperative and always accepted the lowest-priced offer, and in 1984 that offer came from a competitor of the defendants, Iowa Southern Utilities. Finally, on the claim that defendants monopolized the market for delivering electricity to Mount Pleasant, the Court ruled that the claim failed because defendants had never denied any request that they wheel power to the City from outside sources.
 
 
 2
 We agree with the District Court's analysis, and we affirm the judgment in its entirety.[3]
 
 I.
 
 3
 The City owns an electric utility that sells electricity at retail to industrial, commercial, and residential customers. Its service area, which is fixed by the Iowa Commerce Commission, extends to the city limits of Mount Pleasant as they existed at some time before 1974, but does not include subsequently annexed areas. Joint Appendix (J.A.) 722. The municipal utility has generating facilities that can supply most of the electricity it needs, but they run on diesel fuel, and, since the oil embargo in 1974, it has been less expensive for the City to buy wholesale electricity from other utilities than to produce its own. The only existing interconnection between the City and other utilities is a transmission line the defendants built in 1969. J.A. 391.
 
 
 4
 Defendants are separate corporations comprising part of a rural electric cooperative organized in Missouri and Iowa under the Rural Electrification Act of 1936, 7 U.S.C. Secs. 901-16. The cooperative, unlike an investor-owned utility, receives financial assistance from the United States in the form of loans and loan guarantees under the aegis of the Rural Electrification Administration. This organization has three tiers. At the top of the organizational chart is Associated Electric Cooperative, Inc., which owns all but a fraction of the cooperative's electrical-generating capacity,[4] and all of the larger power lines in the cooperative's transmission grid; it controls all of the production and distribution of electricity for the organization. J.A. 197-200. At the next level are six generation-and-transmission cooperatives (G & Ts), including defendants Central Electric Power Cooperative and Northeast Missouri Electric Power Cooperative, each of which owns a portion of the remainder of the transmission grid, and which are responsible for transporting and selling wholesale electricity. Id. The third tier contains 43 local retail-distribution cooperatives, which buy wholesale power from the G & Ts and sell it to the cooperative's consumer-members in their service areas. Id.
 
 
 5
 While management of the cooperative's activities flows down the organizational chart, ownership runs from the bottom up. About 425,000 consumer-members own the 43 local distribution cooperatives. Each member joins the cooperative that sells him retail electricity, and each distribution cooperative is managed by a board of directors elected by its members. Each local cooperative, in turn, owns a portion of the G & T that sells it wholesale power, and the board of each G & T is made up of representatives elected by its cooperative-members, plus two directors of Associated. J.A. 636. Finally, the six G & Ts are common owners of Associated, and each has two representatives on Associated's board of directors--the G & T's general manager and one of its board members. J.A. 627.
 
 
 6
 Each cooperative is autonomous, sets its own rates for the power it sells, and manages its own profits and losses, but each is linked to the organization by long-term, all-requirements supply contracts. Under these agreements, Associated generates and supplies all of the electricity its owners, the G & Ts, need. The G & Ts supply all of the power their owners, the distribution cooperatives, need, and these cooperatives, in turn, supply all of their owners' needs. In utility parlance, these contracts are for "firm" energy; this means that the buyer will pay for the electricity regardless of whether it actually uses the power, and the seller will always make that power available. See J.A. 668-71. The price for firm energy has two components, a demand charge and an energy charge. The demand charge is a set fee for the service of providing elecricity which does not vary, in a contract year, according to the amount of energy actually consumed. The energy component is a direct charge for each unit of electricity that the customer takes, measured in terms of kilowatt hours (kwh). See J.A. 347.
 
 
 7
 The cooperative's in-house demand does not require that it always generate electricity at peak capacity, and, since it reduces the unit cost of producing electricity to operate as near as possible to peak capacity, the cooperative looks for other, nonmember customers, such as the City, during "off-peak" periods. Delivery of this so-called "surplus" power must be interruptible, so that the cooperative can, if necessary, divert electricity from nonmembers to members when its internal demand for electricity approaches its peak. Because this interruptible electricity is less reliable than firm power, it is worth less to the customer, but the unit cost of production generally is higher than that for firm energy, for surplus power is sold only during times of slack demand, when the percentage of production capacity in use is generally lower.
 
 
 8
 Beginning in 1974, the City contracted to buy power from Northeast to supply its wholesale needs. The first contract, which was in effect through 1979, called for the City to buy 3000 kwh of firm power per year at a demand charge of $27.00 per kilowatt and an energy charge of 7.6 mills per kwh, and allowed it to buy an unlimited amount of surplus power, above this block of firm power, for 10.2 mills per kwh. J.A. 492-93, 499. In 1978, Associated's board of directors decided to implement a dual-rate structure for its electricity, with one for the rural members of the cooperative and another, higher rate for surplus power sold to nonmember municipalities. For instance, for the year 1980, Associated charged the City $3.78 per kilowatt per month demand charge and 13 mills per kwh for firm power, and 19.5 mills per kwh for surplus energy. J.A. 347. Some of Associated's directors from Central and Northeast voiced their disagreement at what they called this discrimination against municipalities. J.A. 348.
 
 
 9
 Before the 1974 contract expired at the end of 1979, the City solicited bids for wholesale power from several utilities. Union Electric Company reviewed the request in a very cursory manner and made a vague response. J.A. 515. Iowa Southern Utilities was somewhat less cursory. It made a proposal, but not a very attractive one. J.A. 506-7, 510. Rather than accept these offers, the City chose to enter into a new five-year contract with Northeast, which provided for a 3500-kilowatt block of firm power, at a demand charge of $5.80 per kilowatt per month and an energy charge of 19 mills per kwh, and surplus power at 24.5 mills per kwh. J.A. 519, 525.
 
 
 10
 The City apparently purchased all of its wholesale electricity from the cooperative under this agreement until it expired in 1984, with the exception of several brief periods of curtailment from the cooperative in 1983, when the City bought emergency power from Iowa Southern which was wheeled into Mount Pleasant across the cooperative's transmission grid. J.A. 748-49. Iowa Southern's charge for this power included a wheeling charge of one and one-quarter mills, which it remitted to the cooperative according to an agreement between the cooperative and Iowa Southern. Ibid.
 
 
 11
 Before the 1979 contract between the City and the cooperative expired in 1984 (and after this lawsuit was filed, in 1982), the City again requested bids from several utilities for wholesale electricity. Union Electric replied that the cost of interconnection between it and the City would be about $2 million, and if, "after reviewing the economics of making the tie with Union Electric, [the City] is interested in pursuing this matter further, we would be" willing to discuss the possibility more seriously. J.A. 527. Another supplier, Iowa Electric Light & Power Company, responded in the same vein:
 
 
 12
 To [build a 20-mile power line to interconnect the utilities], at a cost [of] between 1.6 and 2 million dollars, is obviously not economically feasible. The alternative would be for Mt. Pleasant to negotiate a wheeling agreement with Northeast Missouri Electric Co-op to wheel Iowa Electric power from a point ... where we are interconnected.
 
 
 13
 J.A. 528. Northeast offered a new five-year contract providing for an undetermined block of firm power at $8.55 per kilowatt per month demand charge and 25.1 mills per kwh energy charge, and surplus power at 29.2 mills per kwh. J.A. 544.
 
 
 14
 Iowa Southern submitted a proposal for a five-year contract, this time offering Mount Pleasant the option of either paying 1.5 per cent. per month of the cost of building a new interconnection or paying one and one-quarter mills per kwh to have electricity wheeled in over the cooperative's transmission lines. J.A. 547. The proposed rates, not including the wheeling charge, were $7.00 per kilowatt per month demand charge and 14.6 mills per kwh for all electricity, firm or surplus, used. On July 2, 1984, the City accepted this offer, which was much more advantageous than the defendants' proposal; service began under the contract on October 4, 1984, and apparently continues to this day. J.A. 558, 561. All of the power purchased from Iowa Southern has been wheeled across the cooperative's transmission grid.
 
 II.
 
 15
 We think the able District Judge is to be commended for reducing this complex and voluminous case to its essentials. Although we believe the case warrants a full discussion of the basis for our decision, we are, to a large extent, simply expounding on the District Court's analysis.
 
 
 16
 This case is before us on summary judgment. The City argues that summary judgment should rarely be granted in antitrust cases, citing Poller v. Columbia Broadcasting Systems, Inc., 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), and that the moving party "has the burden of clearly establishing the non-existence of any genuine issue of fact that is material to a judgment in his favor." Cedillo v. International Assoc. of Bridge Workers, 603 F.2d 7, 10 (7th Cir.1979). The City also points to language in Admiral Theatre Corp. v. Douglas Theatre Co., 585 F.2d 877, 888 (8th Cir.1978) that, " 'adopting the justifiabl[y] cautious approach utilized by other courts, [we] will not grant summary judgment in a case involving complex antitrust allegations and issues' [unless] 'the movant has established his right to a judgment with such clarity as to leave no room for controversy ....' " (citations omitted). On this basis, the City understandably argues at several points that defendants have not carried their burden of demonstrating the absence of material fact issues.
 
 
 17
 Many of our cases repeat the formula just quoted from Admiral Theatre, that summary judgment is not to be granted unless the moving party "has established his right to a judgment with such clarity as to leave no room for controversy." We doubt that this locution was ever intended to be taken literally. What must have been intended was that all genuine, or all material, controversy be excluded. Otherwise, the rule as announced would collide with the plain words of Fed.R.Civ.P. 56 ("no genuine issue of material fact"). It would almost never be error to deny summary judgment, and every nonfrivolous appeal from an order granting it would necessarily succeed.
 
 
 18
 In any case, whatever the meaning of our earlier cases, a trilogy of recent Supreme Court opinions demonstrates that we should be somewhat more hospitable to summary judgments than in the past. The motion for summary judgment can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those cases that really do raise genuine issues of material fact.
 
 
 19
 In Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the Supreme Court held that the burden on the party moving for summary judgment is only to demonstrate, i.e., "[to] point[ ] out to the District Court," id. 106 S.Ct. at 2554, that the record does not disclose a genuine dispute on a material fact. It is enough for the movant to bring up the fact that the record does not contain such an issue and to identify that part of the record which bears out his assertion. Once this is done, his burden is discharged, and, if the record in fact bears out the claim that no genuine dispute exists on any material fact, it is then the respondent's burden to set forth affirmative evidence, specific facts, showing that there is a genuine dispute on that issue. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). If the respondent fails to carry that burden, summary judgment should be granted.
 
 
 20
 Nor is it correct to claim that a different, heightened standard for summary judgment applies in complex antitrust cases. The Supreme Court has, we think, unmistakeably (though not explicitly) rejected this argument. In the most recent antitrust case to reach the Court on summary judgment, Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), which involved extraordinarily complex litigation ("Two respected District Judges each have authored a number of opinions in this case; the published ones alone would fill an entire volume of the Federal Supplement." Id. 106 S.Ct. at 1351.), the following language appears:
 
 
 21
 Respondents [plaintiffs below] argued before the district court that petitioners had failed to carry their initial burden under Rule 56(c) of demonstrating the absence of a genuine issue of material fact. See Adickes v. S.H. Kress & Co., 398 U.S. 144, [90 S.Ct. 1598, 26 L.Ed.2d 142] (1970). Cf. Catrett v. Johns-Manville Sales Corp., 244 U.S.App.D.C. 160, 756 F.2d 181, cert. granted, 474 U.S. , 106 S.Ct. 342 [88 L.Ed.2d 285] (1985). That issue was resolved in petitioners' favor, and is not before us.
 
 
 22
 106 S.Ct. at 1355 n. 10. The Catrett case cited there was the case ultimately decided as Celotex Corp. v. Catrett. See 106 S.Ct. at 2551. And the issue on which the Supreme Court reversed the judgment in Catrett was precisely the erroneous interpretation of Adickes that the moving party has the "initial burden under Rule 56(c) of demonstrating the absence of a genuine issue of material fact." The implication is clear (at least as clear as any inference drawn from a footnote in the United States Reports) that the Supreme Court would find an error of law in the imposition of a heightened standard for summary judgment in a complex antitrust case.[5]
 
 III.
 
 23
 We turn now to the conspiracy claim and the District Court's ruling under Copperweld. A conspiracy requires a plurality of actors, and the issue with related entities is whether they supply the requisite plurality. Copperweld held that no such plurality exists between a corporation and its wholly owned subsidiary corporation. The City insists that we should not go beyond the literal holding in Copperweld and therefore find that decision not controlling in this case, which does not involve any wholly owned subsidiary of a single parent. We decline this invitation because the logic of Copperweld reaches beyond its bare result, and it is the reasoning of the Court, not just the particular facts before it, that must guide our determination.
 
 
 24
 Copperweld explains that a conglomeration of two or more legally distinct entities cannot conspire among themselves if they "pursue[ ] the common interests of the whole rather than interests separate from those of the [group] itself.... Because [such] coordination ... does not represent a sudden joining of two independent sources of economic power previously pursuing separate interests, it is not activity that warrants Sec. 1 scrutiny." Copperweld, 467 U.S. at 770-71, 104 S.Ct. at 2741-42.
 
 
 25
 The thrust of the holding is that economic reality, not corporate form, should control the decision of whether related entities can conspire. The Copperweld Court's approving citation of Sunkist Growers, Inc. v. Winckler & Smith Citrus Products Co., 370 U.S. 19, 82 S.Ct. 1130, 8 L.Ed.2d 305 (1962), see 467 U.S. at 773 & n. 21, 104 S.Ct. at 2743 & n. 21, illustrates the point. In Sunkist, a case factually quite close to the one before us, the Court held that three related corporations in an agricultural cooperative were a single entity for purposes of statutory immunities from the antitrust laws. One corporation, Sunkist, was owned by a large group of citrus growers, and Sunkist owned another corporation, The Exchange Orange Products Company, as a wholly owned subsidiary. This is the same relation at issue in Copperweld. But the third corporation, The Exchange Lemon Products Company, was owned by a subset of the citrus orchardmen who owned Sunkist, the lemon growers. Without discussing whether the lemon growers made up a majority or a minority of Sunkist's owners, the Court held that all three were a single enterprise, and were therefore exempt from antitrust liability under the immunity statutes.
 
 
 26
 [W]e feel that the 12,000 growers here involved are in practical effect and in the contemplation of the statutes one "organization" or "association" even though they have formally organized themselves into three separate legal entities. To hold otherwise would be to impose grave legal consequences upon organizational distinctions that are of de minimis meaning and effect to these growers who have banded together for processing and marketing purposes.... There is no indication that the use of separate corporations had economic significance in itself or that outsiders considered and dealt with the three entities as independent organizations. That the packing is done by local associations, the advertising, sales, and traffic by divisions of the area association, and the processing by separate organizations does not in our opinion preclude these growers from being considered one organization or association for purposes of the Clayton and Capper-Volstead Acts.
 
 
 27
 370 U.S. at 29, 82 S.Ct. at 1136. It is true that Sunkist was decided under statutes granting immunity from antitrust liability, but we see no reason why, in the absence of a statutory immunity, similar considerations should not guide the determination of whether related entities are a single enterprise for purposes of the conspiracy statute. In either case, a holding that the separate corporations are separate organizations or can conspire together would "impose grave legal consequences upon organizational distinctions that are of de minimis meaning and effect."
 
 
 28
 We also find support in United States v. Citizens & Southern Nat'l Bank, 422 U.S. 86, 95 S.Ct. 2099, 45 L.Ed.2d 41 (1975). There the Bank was prohibited by state law from operating branch banks outside of its home county. Thus, instead of owning de jure branches in other counties, which would have been akin to unincorporated divisions (and contrary to state law), the Bank operated what the Court termed de facto branches, in which the Bank owned five per cent. of the stock, made sure that its officers or other "friends" owned the remainder, and, while not dictating the activities of the branches, exercised significant control over their affairs. The Court assumed that it would not violate the antitrust laws for the Bank to operate the branches as de jure branch banks, and, using this economic reality to slice through the formality of separate incorporation, rejected the government's contention that the related entities were required to compete vigorously with one another. Id. at 111-14, 95 S.Ct. at 2114-15. Though the Court's precise holding was that the District Court's finding that there was no agreement among the parties was not clearly erroneous, this was influenced by the "unusual light" that the entities were, in essence, a single enterprise engaged in correspondent banking, which was permissible under the Sherman Act. Id. at 113-14, 95 S.Ct. at 215.
 
 
 29
 We think our practical approach is consistent with United States v. Topco Associates, Inc., 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972), relied on by plaintiff. Topco involved a cooperative association which was structured in a manner legally almost identical to the structure of defendants here. Twenty-five regional supermarket chains each owned an equal share of Topco, which was the purchasing agent for its owners. None of the owners individually controlled the Association. In the market for grocery products, Topco was a much greater economic force than any of its owners would have been alone, and it was able to buy both name-brand and private-label goods in bulk at significant discounts. Much the same is true in this case, for without the strength in numbers flowing from membership in the cooperative, it is doubtful that any of the distribution or G & T cooperatives alone would have the capital to support an electrical production and transmission operation on the scale of Associated. Thus, an analysis solely in terms of legal ownership and control would probably lead to the conclusion that, as in Topco, 405 U.S. at 601 n. 5, 92 S.Ct. at 1130-31 n. 5, the subsidiary cooperatives here could conspire with their owners.
 
 
 30
 The critical distinction between this case and Topco is that here there is no evidence that any defendant ever pursued interests antithetical to those of the cooperative as a whole, while in Topco the members were actual or potential competitors of each other, and therefore had pursued interests antithetical to the Association's. See id. at 608, 92 S.Ct. at 1133 ("One of the classic examples of a per se violation of Sec. 1 is an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition.... We think it clear that the restraint in this case is a horizontal one, and, therefore, a per se violation of Sec. 1.").[6]
 
 
 31
 The record bears out defendants' claim that the cooperative organization is a single enterprise pursuing a common goal--the provision of low-cost electricity to its rural consumer-members. The burden is therefore on the City to show specific facts which present a triable issue as to whether any of the defendants has pursued interests diverse from those of the cooperative itself. By "diverse" we mean interests which tend to show that any two of the defendants are, or have been, actual or potential competitors, Rothery Storage & Van Co. v. Atlas Van Lines, Inc., 792 F.2d 210, 214-15 (D.C.Cir.1986) cert. denied, --- U.S. ----, 107 S.Ct. 880, 93 L.Ed.2d 834 (1987), or, at the very least, interests which are sufficiently divergent so that a reasonable juror could conclude that the entities have not always worked together for a common cause. Cf. Pink Supply Corp. v. Hiebert, Inc., 788 F.2d 1313 (8th Cir.1986); Victorian House, Inc. v. Fisher Camuto Corp., 769 F.2d 466 (8th Cir.1985). In the language of Copperweld, the City must show facts that could lead a reasonable juror to find the coordination between any two defendants to be a "joining of two independent sources of economic power previously pursuing separate interests." 467 U.S. at 771, 104 S.Ct. at 2741.
 
 
 32
 The City argues that the defendants in fact have independent and conflicting economic interests. For instance, when Associated decided to implement its dual-rate structure, charging a higher rate for electricity sold to municipalities than to consumer-members, two board members from Northeast and Central strenuously objected, calling the rates discriminatory and unfair. J.A. 348. Those G & Ts refused to pay the higher rates and placed the sums necessary to pay the incremental charge in escrow. J.A. 365. Associated then discussed withholding deliveries of power to Northeast and Central if they refused to pay their bills, but a proposed resolution to do so failed to pass. It then resolved to request the G & Ts to arbitrate the dispute and to place the payments in escrow with Associated pending resolution. J.A. 369-70. The City argues that Northeast and Central have several municipal customers, and had lower average demand costs when the price of electricity for members and municipalities was the same, and it was to maintain this advantage that they opposed the dual rates.
 
 
 33
 In addition, some distribution cooperatives apparently argued about how to divide the profits (called "capital credits") earned on sales to municipalities even before the dual-rate system was introduced. J.A. 433. The argument here is also that distribution cooperatives which sold to municipal customers had lower average demand costs, hence higher profit margins and profits, and they did not want to share those profits with cooperatives which did not sell to cities.
 
 
 34
 We agree with the City that these interests were "diverse," but not in the sense necessary to create a fact issue on whether these companies are part of a single enterprise. It will always be true that separate companies, in one enterprise, that are located in separate areas and serve separate customers, will have varying interests. This case, considering the disputes among the defendants on the issue of municipal sales, is a perfect example. Coalitions will come and go according to changing conditions and the interests of the various factions.
 
 
 35
 But is this a sufficient basis from which to draw a reasonable inference that their coordination is a "joining of two independent sources of economic power previously pursuing separate interests"? In this case, we think not. Even though the cooperatives may quarrel among themselves on how to divide the spoils of their economic power, it cannot reasonably be said that they are independent sources of that power. Their power depends, and has always depended, on the cooperation among themselves. They are interdependent, not independent. The disagreements we have described are more like those among the board members of a single enterprise, than those among enterprises which are themselves separate and independent.
 
 
 36
 Finally, the City argues that the cooperatives are potential or actual competitors with each other because (1) they have adjoining service areas and thus compete for new customers who consider locating in their areas and for existing customers who can move or change suppliers and (2) on two occasions, Associated has competed with a G & T for municipal customers. In order to evaluate these arguments, which might be valid in theory, we look at the specific business facts revealed by the record before us.
 
 
 37
 In the deposition of Northeast's general manager, Mr. Ralph Shaw, who also was a board member of Associated, and in the minutes of an Associated board meeting, it appears that Associated resolved to negotiate an interchange agreement between it and the city of Chillicothe, Missouri, in 1982. J.A. 176-77, 193-94. Four of Associated's directors voted against this resolution because they thought the arrangement should have been negotiated between the distribution cooperative and the G & T whose territory included Chillicothe, rather than by Associated.
 
 
 38
 In another episode, Associated resolved to negotiate a similar interchange agreement with Columbia, Missouri, which was within Central's service area, and Central strenuously objected. J.A. 172-73, 352. Mr. Shaw supposed that "territoriality" was the reason Central fought the resolution, and, though he didn't know Central's intent, he supposed that Central would consider negotiating such an agreement if Associated had not.
 
 
 39
 While this demonstrates clearly the conflicting motives that sometimes held sway, this evidence does not reasonably show that these G & Ts are, or have been, independent sources of economic power. Instead, it is only further proof of the internal disputes among the members of the organization over how to conduct its affairs. There is no indication that there was price competition between Associated and either Central or Northeast. We cannot see that this kind of dispute tends to make the members less dependent on one another for their economic power.
 
 IV.
 
 40
 The Robinson-Patman price-discrimination claim is based on the allegation that Northeast sold power to its favored customers, its distribution cooperatives, at prices lower than it sold to the City.[7] One element of a Robinson-Patman claim is that there be two sales to separate entities in interstate commerce. The District Court held that the intra-enterprise transfers between the cooperatives were not "sales" for purposes of the Act, and therefore granted summary judgment on this claim against the City.
 
 
 41
 In Security Tire & Rubber Co. v. Gates Rubber Co., 598 F.2d 962 (5th Cir.1979), cert. denied, 444 U.S. 942, 100 S.Ct. 298, 62 L.Ed.2d 309 (1979), the Court held that a transfer of a product from a parent corporation to its wholly owned subsidiary is not a "sale" under the Robinson-Patman Act, as a matter of law. We discussed this holding in Schaben v. Samuel Moore & Co., 606 F.2d 831, 833 n. 3 (8th Cir.1979), and we declined at that time to adopt the Fifth Circuit's per se rule on the issue, opting instead to rule on the narrower ground that the District Court's factual finding that a transfer between a parent and a wholly owned subsidiary was not a sale was not clearly erroneous.
 
 
 42
 The Sixth Circuit, in Russ' Kwik Car Wash, Inc. v. Marathon Petroleum Co., 772 F.2d 214 (6th Cir.1985) (per curiam), discussed and adopted the Fifth Circuit's per se rule in the light of Copperweld. It reasoned that since a parent and a wholly owned subsidiary are a single economic unit under the Sherman Act, they are also under the Robinson-Patman Act, and "[t]he Robinson-Patman Act is not concerned with transfers between them." Id. at 221. The dissenting judge in Russ' Kwik argued that the Court's inquiry in Copperweld was directed at the Sherman Act's fundamental distinction between concerted and unilateral activity, and, because the Robinson-Patman Act "is not directed at the danger caused by the merging of separate interests," id. at 223, but at unilateral activity, the Copperweld analysis did not apply in that setting. We do not share that concern. Although the Robinson-Patman Act certainly reaches unilateral activity, in the sense of sales by one entity, it is also equally true that there must be two distinct entities, a seller and a buyer, to make out a claim. Thus the focus is on whether sales have occurred, not on whether the seller is engaged in unilateral activity.
 
 
 43
 The City suggests that the form of the transaction, rather than the relationship between the related entities, should control our decision. For support it relies on Schaben, where we recited, as some of the facts which we held were not clearly erroneous, "No money was exchanged between the [related] corporations; the transfer prices were merely bookkeeping entries." 606 F.2d at 833. Here, by contrast, it argues, Northeast actually paid for the electricity, title and risk of loss passed to it, and it was free to price the power for wholesale as it wished.
 
 
 44
 We cannot accept this argument. The relationship between "buyer" and "seller" must be considered, for the Robinson-Patman Act, like the Sherman Act, is designed to protect competition, and it should not reach activity that has no economic consequence. The City complains that Northeast's higher prices to it than to the distribution cooperative surrounding the City hamper its ability to compete at retail. But in reality the cooperative association is a single enterprise, and the City competes at retail not just with the neighboring distribution cooperative, but with Northeast, Associated, and all the other G & T and distribution cooperatives as well. The distribution cooperatives could just as easily have structured the G & Ts and Associated as unincorporated divisions, and in that case the City could not complain about the differences in what it paid for electricity from the cooperative and what the distribution cooperatives "paid." To hold that this transfer is a sale under the Robinson-Patman Act would be to make antitrust liability hinge on the happenstance of the enterprise's internal organization and management practices, which in themselves have no economic significance.
 
 
 45
 Finally, it would, in our opinion, be completely anomalous to hold, on the one hand, that the cooperative is a single enterprise which cannot conspire with itself under the Sherman Act, and, on the other hand, that the same single enterprise cannot enjoy the fruits of vertical integration by transferring goods between its constituent units at a "price" below what it charges outsiders.
 
 V.
 
 46
 We turn finally to the City's monopoly claims. We have no doubt that the District Court was correct to grant summary judgment on the City's claim that the cooperative monopolized the market for wholesale electricity. When the City first established an interconnection with an outside electric utility in 1968, it signed an interchange agreement with Northeast under which the cooperative built the transmission lines that link the City to its power grid. J.A. 390-91. For this the City agreed to pay the cooperative a monthly facilities charge of $1,350.00. J.A. 391. When, in 1974, it decided to turn to outside utilities for its primary supply of wholesale power, it requested bids from three utilities in addition to the cooperative, J.A. 393, and chose the cooperative because it offered the most competitive rates. This occurred again in 1978, when the City sought a new contract because the 1974 agreement was due to expire. But in 1984 the City accepted the offer of another supplier, which had underbid the cooperative.
 
 
 47
 This record reveals no basis on which a juror could reasonably infer that the cooperative dominated the wholesale-supply market to such a point that it had a monopoly in it. Cf. United States v. Aluminum Co. of America, 148 F.2d 416, 424 (2d Cir.1945) ("[Ninety] percent[ ] [of the market] is enough to constitute a monopoly; it is doubtful whether sixty or sixty-four percent would be enough; and certainly thirty-three percent is not.") We reject the City's argument that it was not feasible before 1983 for it to accept service from any utility other than the cooperative. It has admitted that since 1984, and at times in 1983, another utility has wheeled power to it across the cooperative's transmission grid, and it has come forward with no evidence that such wheeling was unavailable before 1983.
 
 
 48
 It is true that the cooperative's conduct since 1983 or 1984 does not alone prove that its earlier conduct was not monopolistic. Yet, even resolving every reasonable inference in the City's favor, we must hold that the City failed to set forth evidence of the cooperative's market power in the relevant geographic area, which is that region in which the City could find an alternative source of wholesale power. Nor do we accept the City's proposed definition of the relevant product market. The City argues that the relevant product is "economical electric energy," i.e., that produced with the aid of a government subsidy, rather than electric power generally. But it showed nothing to indicate that the industry or consumers consider this "product" distinct from all other electric energy, or that there are cross-elasticities of supply and demand which set this product apart; except, that is, to the extent that "economical energy" may be cheaper than other electricity.
 
 
 49
 It would be a strange antitrust doctrine indeed that would place a product in its own market or submarket simply because, though indistinguishable in any other way, it cost less. This would turn competition on its head, for, by definition, any competitor who, for any reason, always priced his product below his competitors' would be a monopolist, and subject to severe civil and criminal sanction. Surely there are any number of sellers who, by virtue of superior skill, advantageous location, or the structure of the market, can undersell their competitors--are they to be, ipso facto, branded monopolists? And what of this case, where the cooperative's "subsidy" is the availability of federal loans and loan guarantees, granted by Congress--are we to say that what Congress gives with one hand it has made illegal with the other? We think not.
 
 
 50
 The City's other monopoly claim is that defendants have monopolized the market for delivering power to Mount Pleasant. It is undisputed that defendants own and control the only transmission lines capable of supplying the quantity of wholesale electricity that the City needs. And, for purposes of this appeal, we assume that it would have been prohibitively expensive for the City to construct or pay for another interconnection with another utility.
 
 
 51
 It is apparent that the cooperative is in a position of economic power, by virtue of its ownership and control of the transmission grid linking the City with other utilities. But the mere possession of such power is not unlawful. It must also have been used to plaintiff's detriment. It is not mere monopoly (a status or condition), but rather monopolization (an activity) that Section 2 condemns. In this case, no such unlawful activity has been shown.
 
 
 52
 As we have already discussed, the cooperative wheeled power from Iowa Southern into the City at times in 1983 and 1984, and has done so continuously since October 4, 1984. Before then, pursuant to the terms of the contract between Northeast and the City, the cooperative occasionally wheeled power into Mount Pleasant from other cities in the transmission grid. The City developed no evidence of any instance in which it was denied wheeling from the cooperative. In fact, the City's utilities superintendent, Mr. James Ritter, stated in his deposition:
 
 
 53
 Q: Do you have any complaint, Mr. Ritter, about the wheeling practices of Northeast?
 
 
 54
 A: The wheeling practices?
 
 
 55
 Q: Uh-huh.
 
 
 56
 A: No.
 
 
 57
 J.A. 774.
 
 
 58
 The District Court held as a matter of law that no reasonable juror could find an illegal monopoly on this record, and we agree.
 
 
 59
 The City's last possible theory is that the cooperative has placed some unreasonable, anti-competitive restriction on the wheeling service. The only condition that the City points to is the price charged for wheeling. It argues that the cooperative was, in effect, able to levy a surcharge on the cost to Mount Pleasant of power from outside sources by tacking on a wheeling charge, and this wheeling charge enabled the cooperative (1) to raise the price for its own electricity up to the sum of the cost of electricity from other sources, plus the wheeling charge, and (2) to reap monopoly profits from the City even when it bought from other suppliers, because the cooperative always earned its wheeling fee.
 
 
 60
 We reject these arguments because they are, at bottom, no more than mere allegation and theory. The record does not contain any facts to support these allegations, and summary judgment is proper because the City has the burden to set forth such facts, if any there are. All we find in the record that bears on this issue is that the cooperative has, since 1983, earned a fee of one and one-quarter mills on every kwh of electricity it has wheeled to the City from Iowa Southern. But there is nothing to indicate that this is unreasonable, greatly in excess of the cooperative's costs, or anything other than a reasonable and customary charge. This single reed cannot support the weight of this entire theory, and it does not breathe life into the City's allegations.
 
 
 61
 Finally, we reject the City's last argument, that summary judgment was inappropriate because additional discovery was necessary in order to develop the facts needed to defeat the motion. This is clearly belied by the chronology of events in this case. The City, knowing the content of the Court's summary-judgment ruling in the Fulton case (brought by one of the co-plaintiffs), filed a fifty-two page brief in opposition to the motion, along with an expert's affidavit and nineteen exhibits, on January 6, 1986. It did not claim then that outstanding discovery precluded summary judgment. The Court ruled on August 1, 1986, granting the motion in part and denying it in part. Then, on December 10, 1986, the Court, sua sponte (as it undeniably has the power to do, see Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986)), granted summary judgment on the portion of the lawsuit that remained. That order was based on the same materials that were before the Court on the original motion, when the City did not argue that there was unfinished discovery. Thus we reject the inconsistent argument made here. That the City may have proceeded with discovery in reliance on the District Court's August ruling, which was unfinished in December, does not mean that it had no opportunity to develop the facts fully before the August ruling.
 
 VI.
 The judgment of the District Court is
 
 62
 Affirmed.
 
 
 
 [1]
 Eight other municipalities in Missouri and Iowa originally joined Mount Pleasant as plaintiffs in this action. They have since settled with defendants, leaving only Mount Pleasant as plaintiff
 
 
 [2]
 The Hon. Stephen N. Limbaugh, United States District Judge for the Eastern and Western Districts of Missouri
 
 
 [3]
 No. 87-1603 is an appeal by defendants from an order of the District Court opining that plaintiff's notice of appeal was timely. This appeal is dismissed as moot. We have already determined this issue against the defendants in rejecting their motion to dismiss the appeal, and the Court en banc has refused to reconsider the motion
 
 
 [4]
 Four generating facilities, representing four per cent. of the cooperative's electric-generation capacity, are owned by generation-and-transmission cooperatives (G & Ts), but are controlled by Associated. J.A. 199
 
 
 [5]
 Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), is not to the contrary. There the Court stated, "We believe that summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot." Id. at 473, 82 S.Ct. at 491 (footnote omitted). We read that language to reiterate the unexceptional rule that summary judgment is not appropriate when there is a genuine dispute about a party's intent or motive, if material to the case, for that creates a triable issue of fact. The key issues in the antitrust case now before us have nothing to do with defendants' motive or intent
 
 
 [6]
 Though this fact--that Topco's members had interests diverse from the cooperative's--was not made explicit in the Court's opinion, it was in the District Court's findings of fact in that case. United States v. Topco Associates, Inc., 319 F.Supp. 1031, 1037 (N.D.Ill.1970)
 
 
 [7]
 After the District Court granted summary judgment against the co-plaintiff City of Fulton on its similar claim, Mount Pleasant moved for leave to amend its complaint to add another price-discrimination claim based on the defendants' sales to other municipalities at prices lower than those charged Mount Pleasant. The District Court denied the motion, and, in light of the late point in the proceeding at which the motion was lodged, we find no abuse of discretion in that ruling