**Billy Ray COUNTS, Individually, in his Official Capacity as a Library Committee member, and Mary Nell Counts, both as parents of Dakota Counts Plaintiffs**

v.

**CEDARVILLE SCHOOL DISTRICT Defendant**

No. CIV.02–2155.

United States District Court,
W.D. Arkansas,
Ft. Smith Division.

April 22, 2003.

Carey Brian Meadors, Pryor, Robertson & Barry, PLLC, Fort Smith, AR, for plaintiffs.

David R. Hogue, Christian Legal Service, Conway, AR, for defendant.

John L. Burnett, Lavey and Burnett, Little Rock, AR, Theresa A. Chmara, Daniel Mach, Martina E. Vandenberg, Jenner & Block, LLC, Washington, DC, for amicus.

### MEMORANDUM OPINION

HENDREN, District Judge.

Now on this 22 day of April, 2003, come on for consideration **Plaintiffs' Motion For Summary Judgment** (document # 9) and defendant's **Motion To Dismiss** (document # 13), and from said motions, the supporting documentation, and the responses thereto, the Court finds and orders as follows:

1. Plaintiffs, Billy Ray Counts, Individually, in his official capacity as a Library committee member, and Mary Nell Counts, both as parents of Dakota Counts (hereinafter called "plaintiffs" or by their individual names, as appropriate) brought suit pursuant to 42 U.S.C. § 1983, alleging that their rights under the First and Fourteenth Amendments to the United States

Constitution were being abridged by the decision of the defendant, Cedarville School District, to restrict the access of students, including Dakota Counts, to certain books in defendant's library. (The defendant, Cedarville School District, will hereinafter be referred to either as the "defendant" or the "District".) Plaintiffs prayed for an injunction requiring defendant to return the books to general circulation in its library, and now move for summary judgment.

Defendant denies that any constitutional rights have been violated by its actions and argues affirmatively that the matter should be dismissed because the plaintiffs lack standing to bring their claims.

2. As a preliminary matter, the Court notes that a Brief of *Amici Curiae* was filed in this matter by numerous groups supporting plaintiffs' motion for summary judgment, to which the defendant has lodged an objection that there is no provision for such a filing. While rare, the Court notes that *amicus* briefs have been received in cases pending before United States District Courts. See, e.g., *Michigan National Bank v. State of Michigan*, 365 U.S. 467, 81 S.Ct. 659, 5 L.Ed.2d 710 (1961) and *I.C.C. v. Allen E. Kroblin, Inc.*, 212 F.2d 555 (8th Cir.1954). However, given the unusual nature of the filing, the Court believes the better course for it to follow is to simply not include the *amicus* brief in the matters it will consider in this case. It will, therefore, follow that course.

■ 3. The Court will first address defendant's motion to dismiss for lack of standing, given that it touches on the juris-

diction of the Court to resolve the substantive issues in this case.[1] Standing is a necessary component of the jurisdiction of an Article III court, which exists to resolve cases or controversies. *Broadrick v. Oklahoma*, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973).

Generally speaking, there are three elements of standing:

* the plaintiff must have suffered an injury in fact, i.e., an invasion of a legally protected interest which is concrete and particularized and actual or imminent rather than conjectural or hypothetical;

* there must be a causal connection between the injury and the conduct complained of; and

* it must be likely, as opposed to merely speculative, that the injury will be redressed by a decision in plaintiff's favor. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

(a) *Claims by Dakota Counts' parents*— The Court first addresses the claims of Billy Ray counts and Mary Nell Counts as parents of Dakota counts. As will be seen from the facts recited in ¶ 5, *infra*, this case involves restrictions on access to certain books in the school libraries of the Cedarville School District. The restrictions require a student to have parental permission to check out the books. Defendant contends that no injury can be shown (i.e., that the case has become moot) because plaintiff Dakota Counts, a Cedarville student, owns several of the books, and her parents have signed a permission slip

---

1. While plaintiffs contend that defendant's reliance on evidentiary matters converts its motion to dismiss into a motion for summary judgment, that rule only applies to F.R.C.P. 12(b)(6) motions, not motions challenging subject matter jurisdiction, which fall under Rule 12(b)(1). The Court therefore has not treated the issues raised by the motion to dismiss under the familiar standards applicable to motions for summary judgment, as requested by plaintiffs, but rather under those applicable to motions to determine subject matter jurisdiction, wherein the Court has the power to decide disputed factual issues. See, e.g., *Osborn v. U.S.*, 918 F.2d 724 (8th Cir. 1990).

allowing her to check the books out of the school library. Thus, defendant argues, Dakota has "unfettered access" to the books.

Plaintiffs counter that Dakota has suffered an injury because there is a burden on her right to access the books—the requirement of parental consent—and that access in one forum is not a constitutional substitute for access in another.

■ The Court is persuaded that Dakota Counts has alleged sufficient injury to give her standing to pursue her claims in this case. The right to read a book is an aspect of the right to receive information and ideas, an "inherent corollary of the rights of free speech and press that are explicitly guaranteed by the Constitution." *Board of Education v. Pico*, 457 U.S. 853, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982). The Supreme Court in *Pico* recognized that a school library is an "environment especially appropriate for the recognition of the First Amendment rights of students."

■ The loss of First Amendment rights, even minimally, is injurious. *Marcus v. Iowa Public Television*, 97 F.3d 1137 (8th Cir.1996). Illustratively, in a case finding political patronage unconstitutional, the Supreme Court has said that "the inducement afforded by placing conditions on a benefit need not be particularly great in order to find that rights have been violated. Rights are infringed both where the government fines a person a penny for being a Republican and where it withholds

the grant of a penny for the same reason." *Elrod v. Burns*, 427 U.S. 347, note 13, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976).

In the case at bar, it is suggested in plaintiffs' Complaint that Dakota's rights are burdened because the books in question are "stigmatized," with resulting "stigmatization" of those who choose to read them ("[c]hildren carrying the book with them in the school will be known to be carrying a 'bad' book.") In addition, should Dakota want to review a passage in one of the books while at school, she cannot simply walk into the library and do so. She must locate the librarian, perhaps waiting her turn to consult the librarian, then ask to check the book out and wait while the librarian verifies that she has parental permission to do so, before she can even open the covers of the book.

The Court finds that these burdens, albeit relatively small, constitute a sufficient allegation of an actual concrete and particularized invasion of a legally protected interest to establish Dakota's standing to bring this suit.[2] Cf. *Watchtower Bible v. Village of Stratton*, 536 U.S. 150, 122 S.Ct. 2080, 153 L.Ed.2d 205 (2002) (requiring a permit—even one granted without cost or waiting period—as a prior condition on the exercise of the right to speak imposes a burden on speech); and *Lamont v. Postmaster General of the United States*, 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965) (requiring addressee of mail to request its delivery in writing abridges First Amendment rights).

2. The Court notes that other forms of First Amendment burden pled in the Complaint—that browsers will not find the book on the shelves and those unaware of its existence would not know to ask for permission to check it out—while not applicable to Dakota, demonstrate the importance of allowing standing for even a minimal invasion of First Amendment rights. Those children whose parents do not want them to check out the

Harry Potter books could hardly be expected to protect their own First Amendment rights, since they would almost certainly be minors who could not sue in their own right and it is unlikely that their parents would go to court to establish their child's legal right to do that which they did not want the child to be able to do in the first place. If a minimal burden will not suffice, the District's action would be impregnable to First Amendment attack.

The fact that Dakota has access to the books at home does not undermine this decision. The Supreme Court has held that "one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Reno v. American Civil Liberties Union*, 521 U.S. 844, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997) (citing *Schneider v. State*, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939)).

Defendant also argues that Dakota's claim was not ripe when filed, because she was not in school on July 3, 2002, the filing date, to request the books. No legal authority or supporting facts are cited for this proposition, and the Court will not further examine it except to note that this is not a case where administrative exhaustion or development of the record is called for, and the constitutional issue is presently fit for decision. Cf. *Texas v. United States*, 523 U.S. 296, 118 S.Ct. 1257, 140 L.Ed.2d 406 (1998).

The motion to dismiss will, therefore, be denied as to the claims of Billy Ray Counts and Mary Nell Counts as parents of Dakota Counts.

(b) *Billy Ray Counts' Individual Claim*—Billy Ray Counts claims—on his own behalf—that the defendant's board's decision "abrogates the Library Committee's and its members' ability to appropriately determine suitable material for including in the library without having an improperly motivated School Board override said determinations." This claim is neither fully fleshed out in the Complaint nor persuasively argued in the briefs. Thus, the Court is shown no basis upon which Billy Ray Counts would have standing in his own right to advance a constitutional claim on the facts presented. The motion to dismiss will, therefore, be granted as to the claim of Billy Ray Counts, Individually.

4. Having concluded that plaintiffs have standing to bring a claim of constitutional violation on behalf of Dakota Counts, the Court now turns to the issue of whether summary judgment in their favor is appropriate.

Summary judgment should be granted when the record, viewed in the light most favorable to the nonmoving party, and giving that party the benefit of all reasonable inferences, shows that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *Walsh v. United States*, 31 F.3d 696 (8th Cir.1994). Summary judgment is not appropriate unless all the evidence points toward one conclusion, and is susceptible of no reasonablé inferences sustaining the position of the nonmoving party. *Hardin v. Hussmann Corp.*, 45 F.3d 262 (8th Cir. 1995). The burden is on the moving party to demonstrate the non-existence of a genuine factual dispute; however, once the moving party has met that burden, the nonmoving party cannot rest on its pleadings, but must come forward with facts showing the existence of a genuine dispute. *City of Mt. Pleasant, Iowa v. Associated Electric Co-op.*, 838 F.2d 268 (8th Cir. 1988).

5. Pursuant to Local Rule 56.1, plaintiffs filed a statement of facts which they contend are not in dispute. Defendant contested only one—it claims that the "secular intent of the School Board in passing the policy which is the subject of this action is in dispute." From the plaintiffs' uncontested submission—and from other facts appearing in the briefs and evidentiary documents which cannot be considered seriously disputed—the following significant undisputed facts are made to appear:

* In November, 2001, Angie Haney (the mother of a child enrolled in the Cedarville School District) and her pastor, Mark

Hodges (who is on the Cedarville School Board) became concerned that a series of books known as the Harry Potter books were in general circulation in the school libraries at Cedarville.

* Hodges and Cedarville School Superintendent Dave Smith contacted Estella Roberts, Cedarville High School librarian, about the matter. Roberts told Hodges and Smith that under school policy, they would need to complete a form—called a Reconsideration Request Form—to bring about any change in the status of the Harry Potter books.

* Hodges gave the blank Reconsideration Request Form to Haney, who completed it and returned it to the defendant. On the form, Haney asked that one of the Harry Potter books, *Harry Potter And The Sorcerer's Stone*, be withdrawn from all students.

* After receiving the Reconsideration Request Form, and pursuant to its stated policies, the defendant formed a Library Committee to consider the matter. The Library Committee consisted of five representatives from the high school, five from the middle school, and five from the elementary school. The five people from each school were the principal, the librarian, a teacher, a student, and the parent of a student from that school.

* The Library Committee reviewed *Harry Potter And The Sorcerer's Stone*, and voted unanimously in favor of keeping the book in circulation without any restrictions.

* After receiving the recommendation of the Library Committee, Roberts made a presentation about the matter to the Cedarville School Board. Defendant's board then voted 3–2 to restrict access not only to *Harry Potter And The Sorcerer's Stone*, but also to the other three books in the Harry Potter series. Members of defendant's board voting to restrict access were Mark Hodges, Jerry Shelly, and Gary Koonce (hereinafter called "Hodges", "Shelly" and "Koonce").

* The Board members voting in favor of restricted access did not do so because of concerns about profanity, sexuality, obscenity, or perversion in the books, nor out of any concern that reading the books had actually led to disruption in the schools. Only one of the three had even read *Harry Potter And The Sorcerer's Stone,* and none of them had read the other three books in the series.

* As a result of the vote of defendant's board, Cedarville High School Principal Glennis Cook issued a memo stating that all Harry Potter books were to be removed from defendant's library shelves and placed "where they are highly visible, yet not accessible to the students unless they are checking them out." To check out the books, a student must have "a signed permission statement from their parent/legal guardian." Hodges, Shelly and Koonce intended this directive to be a restriction on access to the books.

* Plaintiffs Billy Ray Counts and Mary Nell Counts sued on behalf of their minor child Dakota Counts, a Cedarville student, alleging that the restrictions placed on the Harry Potter books violate her First Amendment rights to freedom of speech and to receive information. Billy Ray Counts also alleged an individual claim in his official capacity as a member of the Cedarville School District Library Committee.

* Dakota has already read three of the Harry Potter books, owns the fourth, and has written permission from her parents to check the books out of the school library.

6. Given these undisputed facts, the following issue is presented: Does a school board's decision—to restrict access to library books only to those with parental permission—infringe upon the First

Amendment rights of a student who has such permission? Before the Court can decide this issue on a motion for summary judgment, it must first determine if there is any genuine issue of material fact in dispute concerning whether Dakota's rights are so infringed.

Both this issue and the Court's determination of it must be addressed and decided in light of Supreme Court precedent calling for "the most exacting scrutiny [of] regulations that suppress, disadvantage, or impose differential burdens upon speech because of its content." *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994).

■ 7. In support of their assertion that summary judgment is appropriate, plaintiffs rely on *Sund v. City of Wichita Falls*, 121 F.Supp.2d 530 (N.D.Texas 2000), holding that removing a children's book to the adult section of a public library constituted restriction on access because children searching for the book in the designated children's areas would be unable to locate it and browsers risked never discovering the book at all. These particular burdens, of course, do not affect Dakota in the case at bar since she has access to the books as above noted. However, for the same reasons the Court concluded that she has standing to bring this action, it finds that the stigmatizing effect of having to have parental permission to check out a book constitutes a restriction on access. Further, the fact that Dakota cannot simply go in the library, take the books off the shelf and thumb through them—perhaps to refresh her mind about a favorite passage—without going through the permission and check-out process is a restriction on her access. Thus, unless it is shown that such restrictions are justified, they amount to impermissible infringements of First Amendment rights.

8. Having concluded that a burden on Dakota's right of access exists, the Court must consider whether the restrictions are justified by some exigency of the educational environment in the Cedarville School District.

Hodges, Shelly and Koonce testified by deposition that their vote to restrict access to the Harry Potter books was based on (a) their concern that the books might promote disobedience and disrespect for authority, and (b) the fact that the books deal with "witchcraft" and "the occult." The Court will examine these positions seriatim.

(a) The first asserted justification for the restriction appears to be the shared concern among Hodges, Shelly and Koonce that the Harry Potter books might promote disobedience and disrespect for authority. The constitutional soundness of such a restriction depends on whether there is any evidence to support application of a very narrow exception to the First Amendment rights of primary and secondary public school students. While such students do not shed their constitutional rights at the schoolhouse gate, in First Amendment cases the Supreme Court has recognized a very limited restriction where "necessary to avoid material and substantial interference with schoolwork or discipline." *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969).

The Court in *Tinker* was careful to emphasize how limited this restriction is, and to stress the importance of freedom of speech in the education of America's youth:

> In our system, state-operated schools may not be enclaves of totalitarianism. School officials do not possess absolute authority over their students. Students in school as well as out of school are 'persons' under our Constitution. They are possessed of fundamental rights

which the State must respect, just as they themselves must respect their obligations to the State. In our system, students may not be regarded as closed-circuit recipients of only that which the State chooses to communicate. They may not be confined to the expression of those sentiments that are officially approved. In the absence of a specific showing of constitutionally valid reasons to regulate their speech, students are entitled to freedom of expression of their views.

*Tinker* also quoted with approval from *Keyishian v. Board of Regents,* 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967), as follows:

> The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools. The classroom is peculiarly the "marketplace of ideas." The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth "out of a multitude of tongues, (rather) than through any kind of authoritative selection."

(Internal citations omitted).

Thus, while it is recognized that Boards of Education "have important, delicate, and highly discretionary functions," it is also recognized that there are "none that they may not perform within the limits of the Bill of Rights. That they are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes." *Tinker, id.* (internal citations and quotation marks omitted).

Turning to the evidence which might support defendant's contention that the restrictions in question are "necessary to avoid material and substantial interference with schoolwork or discipline," the Court finds the following relevant testimony[3] in the depositions of Hodges, Shelly and Koonce:

* Hodges (the only one of the three who had actually read an entire Harry Potter book) testified that the books are "going to create problems in the school," and "could create ... anarchy." However he did not know of any behavioral problems that had been created by the series, and he admitted that his vote to restrict access was "a preventative measure at that school to prevent any signs that will come up like Columbine and Jonesboro."

* Shelly (who had not read any of the books) testified that books teaching that sometimes rules need to be disobeyed should not be allowed in the school library.

* Koonce (who had not read any of the books in full but "just kind of read here and there" in the first book of the series) testified that he believed it "could" lead kids into juvenile delinquency, but that he

---

**3.** Defendant attempts to distance itself from this testimony by describing it as "their individual testimony of their individual viewpoints, rather than the purpose of the Board as a whole in passing the restriction." This effort must fail, inasmuch as these three Board members comprised the entire voting majority which imposed the policy in question—the other two Board members voted to leave the books on the shelves without restriction. Thus the individual viewpoints of these three Board members must necessarily be "the purpose of the Board as a whole in passing the restriction." Moreover, the "secular purpose" argument advanced in connection with the "purpose of the Board as a whole" theory is an aspect of establishment clause jurisprudence, and is not particularly applicable to free speech issues, where a secular purpose to restrict access to an idea may be just as impermissible as a religious one. *Westside Community Board of Education v. Mergens,* 496 U.S. 226, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990).

was motivated not by what the students were doing, only by what they "might do later."

There is no evidence that any of the three Board members was aware of any actual disobedience or disrespect that had flowed from a reading of the Harry Potter books. Their concerns are, therefore, speculative. Such speculative apprehensions of possible disturbance are not sufficient to justify the extreme sanction of restricting the free exercise of First Amendment rights in a public school library. As the Supreme Court pointed out in *Tinker*, "in our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression.... Certainly where there is no finding and no showing that engaging in the forbidden conduct would 'materially and substantially interfere with the requirements of appropriate discipline in the operation of the school,' the prohibition cannot be sustained." Accordingly, the Court finds no merit in the first asserted justification for the restriction.

(b) The second asserted justification for the restriction is the shared concerns of Hodges, Shelly and Koonce that the Harry Potter books deal with "witchcraft" and "the occult". The Court notes that all three men appear to strongly disapprove of "witchcraft" and "the occult."

This second asserted basis for restricting access to the books is, in the Court's view, no more persuasive than was the first. In the words of *Tinker*, quoted above, "students may not be regarded as closed-circuit recipients of only that which the State chooses to communicate. They may not be confined to the expression of those sentiments that are officially approved."

Along with the freedom of expression considerations which apply when witchcraft and the occult are viewed simply as ideas to which students have a right to choose to be exposed, another First Amendment consideration comes into play. The proof before the Court shows that Hodges, Shelly and Koonce admittedly want to restrict access to the books because of their shared belief that the books promote a particular religion, e.g.:

* Hodges testified that witchcraft is a religion and that he objected to a book which would expose Cedarville students to the "witchcraft religion."

* Shelly testified that he objected to the books because they "teach witchcraft"—but that if the books "promoted Christianity" he would not object to them.

* Koonce testified that the books "teach about witchcraft," and that witchcraft is a religion.

Regardless of the personal distaste with which these individuals regard "witchcraft," it is not properly within their power and authority as members of defendant's school board to prevent the students at Cedarville from reading about it. As the Supreme Court said in *Pico, supra,*

[o]ur Constitution does not permit the official suppression of *ideas*. Thus whether petitioners' removal of books from their school libraries denied respondents their First Amendment rights depends upon the motivation behind petitioners' actions. If petitioners *intended* by their removal decision to deny respondents access to ideas with which petitioners disagreed, and if this intent was the decisive factor in petitioners' decision, the petitioners have exercised their discretion in violation of the Constitution.... In brief, we hold that local school boards may not remove books from school library shelves simply because they dislike the ideas contained in those books and seek by their removal to "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion."

(Internal citations omitted.)

The Court, therefore, finds no merit in the second asserted justification for the restrictions in question.

9. There is no evidence shown to the Court which might reasonably have led defendant's Board members "to forecast substantial disruption of or material interference with school activities" if students were to be allowed unfettered access to the Harry Potter books (as would be required to bring them within the narrow *Tinker* restriction), nor can the defendant permissibly restrict access on the basis of the ideas expressed therein—whether religious or secular. These are the reasons given by the three individuals who, by their votes as a majority of defendant's five-member board, made defendant's decision to restrict access.

Accordingly, based upon the testimony of the individuals who cast the deciding votes in favor of the policy herein challenged, the Court finds there is no genuine dispute as to the material relevant facts and that, when the evidence is viewed in the light most favorable to the defendant, the conclusion is inevitable that defendant removed the books from its library shelves for reasons not authorized by the Constitution.

There being no genuine issue of material fact in dispute as to these matters, the Court finds that Dakota Counts' First Amendment rights are being infringed by defendant's decision to restrict access to the Harry Potter books to those students whose parents sign a permission slip allowing them to check out the books. Summary judgment in her favor will therefore be granted.

**IT IS THEREFORE ORDERED** that defendant's **Motion To Dismiss is granted in part and denied in part.**

The motion is **granted insofar as it seeks dismissal of the claim of Billy Ray Counts, Individually.**

The motion is **denied insofar as it seeks dismissal of the claims of Billy Ray Counts and Mary Nell Counts as parents and next friends of Dakota Counts.**

**IT IS FURTHER ORDERED** that Plaintiffs' **Motion For Summary Judgment** is granted.

**IT IS FURTHER ORDERED** that plaintiff will be entitled to a reasonable attorney's fee and costs upon application therefor within fourteen (14) days of the date of this Order. Defendant shall have eleven (11) days from service of any such application to lodge its objections thereto.

**IT IS FURTHER ORDERED** that the Court's decisions in this matter will be given effect by Order entered of even date herewith.

**IT IS SO ORDERED.**