**TRUGMAN–NASH, INC. and Trio Cheese Imports, Inc., Plaintiffs,**

v.

**NEW ZEALAND DAIRY BOARD, Mil Products Holdings (North America) Inc. and Western Dairy Products, Inc., Defendants.**

**WESTERN DAIRY PRODUCTS, INC., Plaintiff,**

v.

**TRUGMAN–NASH, INC. and Trio Cheese, Inc., Defendants.**

Nos. 93 Civ. 8321 (CSH), 93 Civ. 8329 (CSH).

United States District Court, S.D. New York.

Oct. 8, 1996.

Zuckerman, Spaeder, Golstein, Taylor & Kolker, New York City (Edward Little, Howard Adler, of counsel), for Trugman–Nash, Inc. and Trio Cheese Imports, Inc.

Baker & McKenzie, New York City (Lawrence W. Newman, Craig Celniker, Lalit Loomb, of counsel), for New Zealand Dairy Board, Milk Products Holdings (North America), Inc. and Western Dairy Products, Inc.

## MEMORANDUM OPINION

HAIGHT, Senior District Judge:

These consolidated cases arise out of the importation of New Zealand cheese into the United States. The factual background and the nature of certain pending motions are described in the Court's opinion dated February 21, 1996. Subsequently the Court heard oral argument. This opinion resolves the pending motions.

Familiarity with the prior opinion is presumed. For present purposes, it is sufficient to say that plaintiffs in 93 Civ. 8321 are domestic importers of New Zealand cheese under licenses issued by the United States Department of Agriculture ("USDA"). Defendants in that action consist of the New Zealand Dairy Board ("the NZDB" or "the Board") and two Delaware corporations closely related to NZDB and each other. Plaintiffs complain of defendants' failure to deliver a contracted-for quantity of cheese. Their claims sound in breach of contract, *quantum meruit*, common law fraud, and antitrust. Defendants move to dismiss the fraud and antitrust claims. In 93 Civ. 8329, Western Dairy Products, Inc. ("Western Dairy"), a defendant in the other case with

whom plaintiffs dealt directly, moves for partial summary judgment to recover an allegedly undisputed amount due.

## I

In 93 Civ. 8321, defendants move to dismiss plaintiffs' fourth and fifth claims. Those claims, as set forth in an amended complaint, allege that defendants violated the antitrust laws of the United States. The fourth claim alleges that defendants entered into a conspiracy in restraint of trade, in violation of section 1 of the Sherman Act, 15 U.S.C. § 1. The fifth claim alleges that defendants monopolized the importation, distribution and sale in the United States of New Zealand cheese, in violation of section 2 of the Sherman Act, 15 U.S.C. § 2.

Defendants make two arguments in support of their motion. First, they contend that this Court lacks jurisdiction to adjudicate plaintiffs' antitrust claims, or that it should refrain from exercising any jurisdiction that might exist. Second, defendants contend that the fourth and fifth claims fail to state claims upon which relief can be granted.

## A

█ Defendants' jurisdictional arguments are founded primarily upon the manner in which the New Zealand Dairy Board Act of 1961, as amended, created and governs the conduct of the NZDB. On that aspect of the case, defendants invoke the doctrines of act of state, foreign sovereign compulsion, and international comity. These doctrines, while separately briefed and argued, overlap to a large degree. I think that the applicability of all three doctrines to the case at bar depends upon the answer to the same question: whether New Zealand law compels defendants to conduct their affairs in the manner described in the amended complaint, which plaintiffs say violate American antitrust law.[1] If that question be answered in the negative, then there is no apparent impediment to defendants' compliance with the laws of both countries, and no basis for immunizing defendants from the consequences of American antitrust violations.

These conclusions follow from the Supreme Court's decision in *Hartford Fire Insurance Co. v. California,* 509 U.S. 764, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993). Plaintiffs alleged that domestic primary insurers and reinsurers, brokers, and trade associations, together with British reinsurers based in London, violated the Sherman Act by engaging in various conspiracies aimed at forcing American primary insurers to change the terms of their liability policies to conform with policies the defendants wished to sell. I am concerned in the case at bar only with the Court's holding with respect to the British reinsurers.

The British reinsurers argued that the principle of international comity precluded District Court jurisdiction over the foreign conduct alleged, a contention that the District Court accepted. The Ninth Circuit reversed. *In re Insurance Antitrust Litigation,* 938 F.2d 919, 932–34 (9th Cir.1991).[2] The Court of Appeals applied the six factors enumerated in its prior decisions in *Timberlane Lumber Co. v. Bank of America,* 549 F.2d 597 (9th Cir.1976) (*Timberlane I*), and 749 F.2d 1378 (9th Cir.1984) (*Timberlane II*). The balancing of those factors, the Ninth Circuit concluded in *Hartford,* militated in favor of District Court jurisdiction over plaintiffs' antitrust claims against the British reinsurers. The *Timberlane* case reached the opposite conclusion, which defendants at bar understandably stress; but the Court of Appeals explained the different result in *Hartford* by saying at 938 F.2d at 933:

> The comparison led to the ultimate dismissal of the Timberlane suit in *Timberlane II:* the effects of the conduct charged were substantial in Honduras and minimal in the United States. *Timberlane II,* 749 F.2d at 1385. The case here is just the reverse. The effects are minimal, or at any rate not large in England, and they are, as implicitly found by the district court, "direct, substantial, and reasonably

---

1. For purposes of this motion, I treat plaintiffs' factual allegations as true.

2. I will hereafter refer to the Ninth Circuit's decision as *"Hartford"*, to conform to the title of the case in the Supreme Court.

foreseeable" in the United States, as to which Lloyds does at least half of its casualty underwriting. Accepting as true the plaintiffs' allegations, the actions of the foreign defendants have had the kind of "real economic consequences" for the American economy that strongly weigh in favor of the exercise of jurisdiction.

The Supreme Court affirmed the Ninth Circuit, but I think it fair to say that its analysis was more sharply focused. In deciding whether "certain claims against the London reinsurers should have been dismissed as improper applications of the Sherman Act to foreign conduct," 509 U.S. at 794–95, 113 S.Ct. at 2908, the Court identified as "[t]he only substantial question in this litigation ... whether there is in fact a true conflict between domestic and foreign law." Id. at 798, 113 S.Ct. at 2910 (citations and internal quotation marks omitted). Answering that question in the negative, the Court accepted the British reinsurers' assertion "that Parliament has established a comprehensive regulatory regime over the London reinsurance market and that the conduct alleged here was perfectly consistent with British law and policy." Id. at 798–99, 113 S.Ct. at 2910. "But," the Court continued, "this is not to state a conflict." The lawfulness of a foreign defendant's conduct under foreign law is not dispositive on the issue of conflict vel non with American law; and that is so, "even where the foreign state has a strong policy to permit or encourage such conduct." Id. at 799, 113 S.Ct. at 2910. No conflict exists "where a person subject to regulation by two states can comply with the laws of both"; and that circumstance obtained in Hartford, "[s]ince the London reinsurers do not argue that British law requires them to act in some fashion prohibited by the law of the United States, or claim that their compliance with the law of both countries is otherwise impossible." Id. (citations and interior quotation marks omitted). In the absence of any demonstrated conflict between American antitrust law and British law, the foreign conduct of the British reinsurers was subject to District Court antitrust scrutiny.

3. The text of the Act submitted with the motion papers includes all amendments as of June 30, 1993.

Accordingly, I conceive the threshold question in the case at bar to be whether New Zealand law requires defendants to engage in the conduct which plaintiffs allege violates the Sherman Act.

B

On August 30, 1961, the New Zealand Parliament enacted the Dairy Board Act of 1961 (hereinafter "the Act"), which came into force on September 1 of that year.[3] Act, § 1. The Act established "a Board, to be called the New Zealand Dairy Board," § 3(1), which "is a body corporate, with perpetual succession and a common seal." § 3(4).

The Board is comprised of two directors appointed by the Minister, a government official, and eleven directors appointed or elected by 15 cooperative companies in the dairy industry. Act, § 3AA. The Board elects its Chairman. § 5(1).

§ 14 of the Act is captioned "General functions of the Board." That section provides in part:

(1) The general functions of the Board shall be—

(a) Repealed

(b) To acquire, pay for, and market such export produce as the Board may from time to time determine:

(c) To control the export of dairy produce other than dairy produce acquired and marketed by the Board ..."

§ 15 is captioned "Board to comply with general trade policy of Government." That section provides:

In the exercise of its functions and powers under this Act the Board shall comply with the general trade policy of the Government of New Zealand, and shall comply with any general or special directions given by the Minister pursuant to the policy of the Government in relation thereto.

Part II of the Act is captioned generally "Marketing of Export Produce." § 17 of the

Act falls within Part II. § 17 provides in part:

17. Powers of Board as to acquisition and marketing of export produce

(1) Without limiting any of the powers conferred on the Board by this Act or otherwise howsoever, the Board shall have full authority to make and carry out such arrangements as it thinks proper for any of the following purposes:

(a) For the acquisition and marketing by the Board of export produce:

(b) For the handling, pooling, transport, and storage of export produce:

(c) For the consignment of export produce on such terms and in such quantities as it thinks fit:

(d) For the insurance against loss of export produce:

(e) For the establishment of a fund for the purpose of meeting any loss of or damage to export produce acquired by the Board or for the taking of such other steps as the Board thinks fit for that purpose:

(f) For the further treatment, processing, or packing of export produce:

(g) For furthering the sale or export of diary produce:

(h) Subject to subsections (1A) to (1F) of this section, for prohibiting, restricting, and controlling the export of any export produce other than by the Board:

(i) Generally for all such matters as are necessary for the exercise of the functions and powers of the Board under this Part of this Act.

(1A) Any person who wishes to export dairy produce of any kind or description may apply to the Board for permission to do so, specifying the markets where the produce is intended to be sold; and, having had regard to—

(a) The extent to which the markets are in states that do not impose quantitative restrictions on the importation of dairy produce; and

(b) The extent to which the export of the produce to the markets might result in a direct or indirect reduction of the overall returns to the New Zealand dairy industry; and

(c) Any other relevant guidelines for the time being established by the Board for the purposes of this section and published by the Board,—the Board shall grant or refuse permission.

The manner in which the NZDB has structured the exportation of New Zealand cheese to the United States is described in the amended complaint and the motion papers. There appears to be no dispute on that subject.

As noted, New Zealand's thousands of dairy farmers were formed into 15 cooperatives. The Board formed defendant Milk Products Holdings (North America) Inc. ("MP Holdings"), a Delaware corporation, as its wholly owned subsidiary, for the purpose of holding the stock of other United States corporations. Amended Complaint, ¶ 4. The Board also caused the creation of defendant Western Dairy, a Delaware corporation and a wholly owned subsidiary of MP Holdings, to act as the Board's agent in the distribution and sale of New Zealand dairy products in the United States. Id., ¶ 5. Western Dairy, like the plaintiffs, holds licenses from the USDA to import New Zealand cheese into the United States. Pursuant to USDA regulations, Western Dairy has been designated as the "preferred" importer of New Zealand cheese, which entitles it to receive a specific portion of the quota amount of cheeses allotted to New Zealand for importation, together with any other amounts to which Western Dairy might be entitled by other licenses it holds. Honeyfield Affidavit, ¶ 7.

Plaintiffs say, and defendants do not appear to question, that the NZDB has exercised the powers conferred upon it by the Act to become "the *de facto* exclusive purchaser and exporter of New Zealand dairy produce, including cheese." Amended Complaint, ¶ 13. And American importers such as plaintiffs may purchase New Zealand cheese only from Western Dairy. In defendants' phrasing, the NZDB utilizes Western Dairy "as its conduit for all New Zealand cheeses sold to import licensees in the United States." Honeyfield Affidavit, ¶ 9. Plaintiffs state the proposition in less genteel

terms. "United States importers, such as the plaintiffs, have no alternative but to procure New Zealand dairy produce, including cheese, from the monolithic export cartel created by the Board, its Directors, and co-conspirators." Amended Complaint, ¶ 13.

The market price of cheese in the United States is set at weekly intervals by the National Cheese Exchange, also known as the Green Bay Cheese Exchange ("the Exchange"). Plaintiffs purchase New Zealand cheese from Western Dairy at prices slightly discounted from the most recent Exchange quotes. Thus, the two purchase orders giving rise to this litigation were based upon prices quoted by Western Dairy at, respectively, 6 cents and 8 cents below the Exchange quotes in effect on the Friday before the preparation of entry documents for the cheese covered by the purchase orders. Amended Complaint, ¶ 17.

Plaintiffs do not suggest that defendants control or influence in any way the price quotations on the Green Bay Cheese Exchange. The gravamen of plaintiffs' antitrust charges is that they cannot deal directly and individually with New Zealand dairy farmers or cooperatives, in an effort to obtain a greater discount from the Exchange rate, which is to say, to pay a lower price for the cheese plaintiffs then resell in the American market. Counsel for plaintiffs put it this way at the oral argument:

> The point is that if this were a free market, if these 15 combines weren't cooperating through the dairy board in this price cartel and we could go to one or the other, we wouldn't be getting a rate 6 cents off of the floating market rate, we would be getting 10, 20, 30 cents cheaper.

Tr. 35.

Moreover, plaintiffs argue, defendants are practicing a form of price control that is not mandated by the New Zealand Dairy Board Act:

> What we are complaining about is that just because the New Zealand government said, poof, there is a dairy board and that has broad discretion to control the market, the New Zealand government didn't say,

Dairy board create a price cartel, you sell every gram of cheese, you set the price. Tr. 36–37.

Plaintiffs are correct. I do not find any language in the Act that mandates the pricing and selling structure that the Board devised and implemented. The Act created the Board; defines the Board's "general functions" in language that is general indeed; commands the Board, in comparable language, to "comply with the general trade policy of the Government of New Zealand," an unsurprising directive for the Parliament to include.

§ 17 of the Act confers broad powers upon the Board, and defendants rely primarily upon that section to show that the statute compelled the conduct of which plaintiffs complain. But I do not think that the language bears that interpretation. § 17(1) gives the Board "full authority to make and carry out such arrangements as it thinks proper" for, *inter alia*, "the acquisition and marketing by the Board of export produce," § 17(1)(a), and "the consignment of export produce on such terms and in such quantities as it thinks fit," § 17(1)(c). Those provisions certainly authorize the Board to market all export produce itself, and consequently to funnel all cheese exports to the United States through Western Dairy, as indeed it has done. However, the Act does not require that all export produce be marketed by or through the Board; § 17(1A) permits "any person who wishes to export dairy produce" to "apply to the Board for permission to do so," in which event "the Board shall grant or refuse permission." In evaluating such a request, the Act commands the Board to "give regard," *inter alia*, to "[t]he extent to which the export of the produce to the markets might result in a direct or indirect reduction of the overall returns to the New Zealand dairy industry," § 17(1A)(b). That particular provision no doubt reflects Parliament's unexceptionable policy of maximizing New Zealand's dairy product income; but the statute falls well short of compelling any particular commercial arrangements to carry that policy out.

Accordingly the most that can be said for the defendant Board is that the New Zealand

Parliament established a statutory scheme conferring comprehensive powers upon it, and that the Board's conduct alleged here is perfectly consistent with New Zealand law and policy. That is the showing made by the English reinsurers in *Hartford;* but, as that case holds, it is not sufficient to create a conflict with American antitrust law.

### C

■ Accordingly the present defendants' invocation of international comity avails them nothing; and the same result necessarily follows with respect to the doctrine of foreign sovereign compulsion, since the Act cannot be read to compel the particular conduct alleged in the amended complaint.

But defendants make an additional argument with respect to the act of state doctrine. They contend that "the issue of compulsion is irrelevant to the act of state doctrine analysis," which focuses instead upon the validity of the foreign state's legislative enactment. Defendants' Reply Brief at 14. In defendants' view, "the act of state doctrine is properly invoked when the validity of a sovereign act, taken within the territory of that sovereign, is necessarily at issue"; in such a circumstance, the argument concludes, "the Court should apply the act of state doctrine to hold that Act valid and refrain from adjudicating [plaintiffs'] challenge to it." *Id.*

■ The act of state doctrine has no application to this case. Notwithstanding defendants' characterization of the action in their briefs, plaintiffs are not challenging the validity of the New Zealand Dairy Board Act. Rather, plaintiffs challenge the particular conduct indulged in by the defendants pursuant to powers conferred by that statute. It is a necessary factual predicate for application of the act of state doctrine that "the relief sought or the defense interposed would have required a court in the United States to declare invalid the official act of a foreign sovereign performed within its own territory." *W.S. Kirkpatrick & Co., Inc. v. Environmental Tectonics Corp., International,* 493 U.S. 400, 405, 110 S.Ct. 701, 704, 107 L.Ed.2d 816 (1990). I need not declare the Dairy Board Act invalid in order to conclude

that the defendants' conduct thereunder violated the Sherman Act. The case at bar may be contrasted with *Hunt v. Mobil Oil Corp.,* 550 F.2d 68 (2d Cir.1977), in which an independent American oil producer holding a Libyan oil concession asserted an antitrust claim against major American oil companies for conspiring successfully to obtain a Libyan government decree nationalizing plaintiff's Libyan interests. Although plaintiff did not name the Libyan government as a party defendant, the Second Circuit observed that "its claim is admittedly not viable unless the judicial branch examines the motivation of the Libyan action and that inevitably involves its validity." 550 F.2d at 77. In that circumstance, the act of state doctrine was applied to bar the antitrust claim. The case at bar does not involve the motivation of a foreign state's nationalization of property within its territory. The New Zealand Parliament's motivation in enacting the Dairy Board Act is manifest, and plaintiffs do not challenge the validity of New Zealand's conduct in enacting it.

My conclusion that the act of state doctrine does not apply to this case is reinforced by certain declarations made on behalf of defendants in a different setting. In March 1995, the United States Department of Agriculture was conducting public hearings to consider revisions to USDA regulations governing the importation of certain cheese and noncheese dairy products. Representatives of plaintiffs and defendants participated, taking positions opposed to each other. It is not necessary to recount the issues in detail. The significance of the hearings for present purposes lies in descriptive statements made by NZDB representatives about the Board and its functions.

Specifically, Graeme Honeyfield, president of Western Dairy, appeared at a hearing on March 10, 1995 "on behalf of Western Dairy Products and its parent, the New Zealand Dairy Board, in response to the Department's invitation to present views on the possible changes in the regulation of dairy product imports." Tr. 100. A time came when Mr. Honeyfield was moved to say:

I think it's fair to comment, and I'd like to put on the record, that the New Zealand

914

Dairy Board is an entity that is owned by the cooperative dairy farmers in New Zealand. It is not controlled by any other organization other than the 14,000 dairy farmers and the dairy Board operates as that marketing arm with the full consent of those farmers. And in fact, a recent survey in New Zealand of those farmers reported that 93 percent of those farmers wanted to maintain the current system. So it is certainly not what might be traditional [sic] termed the "state trading organization." There is not government involved in the operation, of New Zealand Diary Board and its marketing.

Tr. 109–110.

On March 17, 1995, counsel for the NZDB and Western Dairy submitted to the USDA a written "rebuttal statement," which states in part:

The Board is a cooperatively structured organization which operates as the export marketing arm of the New Zealand dairy industry. It is owned by the supplying Co-operatives, which in turn are owned by New Zealand's dairy farmers, whose milk is processed by the Co-operatives for export by the Dairy Board. Thus, the Board is a commercial organization operating as an independent entity, funded entirely by the farmer owners without taxpayer assistance. It is the industry's choice, which is to say the desire of New Zealand dairy farmers, to structure their business in this way, with the common objective of maximizing returns from export marketings. An independent survey recently conducted resulted in 89% of dairy farmers supporting the Board's marketing of NZ dairy exports.

These declarations, admissible against defendants under Rule 801(d)(2), Fed.R.Evid., are inconsistent with their litigation position that the act of state doctrine shields the Board's conduct from an American court's scrutiny.[4]

In sum, the doctrines of international comity, foreign sovereign compulsion, and act of state, viewed separately or together, do not preclude this Court from exercising jurisdiction over plaintiffs' antitrust claims.

## II

Defendants also argue that plaintiffs' antitrust claims raise nonjusticiable political questions. This is urged as an alternative basis for dismissal.

Defendants' argument necessarily focuses upon the actions of the United States government, not the government of New Zealand. That is because "[t]he political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Association v. American Cetacean Society*, 478 U.S. 221, 230, 106 S.Ct. 2860, 2866, 92 L.Ed.2d 166 (1986). The Judiciary is regarded as "particularly ill suited to make such decisions, as courts are fundamentally underequipped to formulate national policies or develop standards for matters not legal in nature." *Id.* (citation and quotation marks omitted).

Defendants say that these considerations are implicated in the case at bar because plaintiffs' complaint "attack[s] the entire statutory and regulatory scheme that governs the importation of foreign cheese into the U.S." Defendants' Main Brief at 17. But the amended complaint cannot reasonably be read in that manner. As the allegations that defendants themselves summarize in their brief reveal, plaintiffs are attacking the conduct of defendants and its effect upon the prices plaintiffs must pay for New Zealand cheese. While these economic consequences occur within the context of an import quota system fashioned by the Congress and Executive Branch of the United States government, it is far too much of a stretch to say that the amended complaint "challenges the substance" of that statutory and regulatory authority. *Id.* at 22. In this action at least, plaintiffs do not challenge the acts of the

4. These statements run equally counter to defendants' invocation of the doctrines of international comity and foreign sovereign compulsion.

Congress, expressed in statutes or treaties, or the acts of the Executive, expressed in regulations. On the contrary: plaintiffs proclaim and celebrate the existence of a licensed quota system which endows the licenses they hold with commercial value. The gravamen of their antitrust claims is that defendants' conduct deprives them of the full benefit of import licenses generated under domestic law.

It follows that the political question doctrine does not preclude this Court's exercise of jurisdiction over plaintiffs' antitrust claims.

Having dealt with these objections to the Court's jurisdiction over those antitrust claims, I now turn to their legal sufficiency.

### III

Defendants move to dismiss plaintiffs' antitrust claims under Rule 12(b)(6), Fed.R.Civ. P., for failure to state a claim.

On a motion to dismiss under Rule 12(b)(6), the trial court's function "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980); *see Ricciuti v. N.Y.C. Transit Authority,* 941 F.2d 119, 124 (2d Cir.1991). "[T]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). The district court should grant a Rule 12(b)(6) motion "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984) (*citing Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957)).

Except in certain circumstances, consideration of a motion to dismiss the complaint must focus on the allegations contained on the face of the complaint. *See Cortec Industries, Inc. v. Sum Holding, L.P.,* 949 F.2d 42, 47 (2d Cir.1991), *cert. denied,* 503 U.S. 960, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992); *Kramer v. Time Warner, Inc.,* 937 F.2d 767, 773 (2d Cir.1991). On a motion to dismiss, a district court must accept plaintiff's well-pleaded factual allegations as true, *Papasan v. Allain,* 478 U.S. 265, 283, 106 S.Ct. 2932, 2943, 92 L.Ed.2d 209 (1986), and the allegations must be "construed favorably to the plaintiff." *LaBounty v. Adler,* 933 F.2d 121, 123 (2d Cir.1991). "[A] Rule 12(b)(6) motion to dismiss need not be granted nor denied in toto but may be granted as to part of a complaint and denied as to the remainder." *Decker v. Massey–Ferguson, Ltd.,* 681 F.2d 111, 115 (2d Cir.1982).

These strictures apply with particular force to antitrust claims. In *Hospital Building Co. v. Trustees of Rex Hospital,* 425 U.S. 738, 746, 96 S.Ct. 1848, 1853, 48 L.Ed.2d 338 (1976), the Supreme Court said:

> We have held that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957) (footnote omitted). And in antitrust cases, where "the proof is largely in the hands of the alleged conspirators," *Poller v. Columbia Broadcasting,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962), dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly.

The question is whether plaintiffs' complaint, read in the light required by these authorities, "states a claim upon which relief can be granted under the Sherman Act." *Id.* at 747, 96 S.Ct. at 1853–54 (footnote omitted).

### A

▮▮▮ Plaintiffs' fourth claim alleges that defendants violated § 1 of the Sherman Act, 15 U.S.C. § 1. That section forbids "[e]very contract, combination ... or conspiracy, in restraint of trade or commerce among the several States." It is now well established "that the Sherman Act applies to foreign conduct that was meant to produce and did produce some substantial effect in the United

States." *Hartford,* 509 U.S. at 796, 113 S.Ct. at 2909.[5]

Plaintiffs' amended complaint alleges that the NDZB and its co-conspirators have created an "export cartel" setting "export prices for New Zealand dairy products, including cheese, higher than those that would have prevailed if New Zealand dairy manufacturers had sold independently in a free and open competitive market." As a result, "plaintiffs and other American importers of New Zealand dairy produce, including cheese, have been forced to pay higher prices" than they would otherwise have had to pay. Amended Complaint, ¶¶ 47, 48, 49(c), 50(b). It follows, plaintiffs argue, that they have sufficiently alleged a price-fixing cartel which is unlawful *per se,* thereby relieving them of the necessity of pleading or proving the reasonableness of the price as fixed, or the relevant market. Plaintiffs' Brief at 29.

Defendants argue that plaintiffs have not adequately alleged a § 1 conspiracy. Their first contention is that the amended complaint does not plead the requisite plurality of conspirators.

■ "The Sherman Act contains a basic distinction between concerted and independent action." *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 767, 104 S.Ct. 2731, 2739, 81 L.Ed.2d 628 (1984) (citation and internal quotation marks omitted). While the conduct of a single firm can violate § 2 of the statute if it threatens actual monopolization, § 1, "in contrast, reaches unreasonable restraints of trade effected by a 'contract, combination ... or conspiracy' between *separate* entities." *Id.* at 767–68, 104 S.Ct. at 2740 (emphasis in original). "An agreement between two or more persons is fundamental to any § 1 claim." *Volvo North America Corp. v. Men's International Professional Tennis Council,* 857 F.2d 55, 70 (2d Cir.1988).

*Copperweld* holds that "the coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of single enterprise for purposes of § 1 of the Sher-

man Act," so that a corporation "and its wholly owned subsidiary ... are incapable of conspiring with each other for purposes of § 1 of the Sherman Act." 467 U.S. at 771, 777, 104 S.Ct. at 2741, 2745. It follows that in the case at bar, the NZDB, MP Holdings and Western Dairy must be regarded as a single enterprise, insufficient to satisfy § 1's requirement that there be at least two conspirators. I do not understand plaintiffs to contend otherwise.

Plaintiffs profess to find the requisite plurality of conspirators among the dairy farmers of New Zealand. Thus ¶ 47 of the amended complaint alleges:

> This claim is asserted against New Zealand Dairy Board for injuries to plaintiffs' business and property caused by the inflation of export prices on New Zealand cheese that has resulted from the unlawful combination and conspiracy among the New Zealand Dairy Board and New Zealand dairy manufacturers that have collectively refused to sell dairy produce, including cheese, to United States importers in a free and open competitive market but have instead combined and conspired to create an export cartel.

In briefs and oral argument, counsel for plaintiffs further refine this concept to consist of the 15 dairy cooperatives formed to act in concert with the Board. It appears from the record that plaintiff may have first learned of the cooperatives from affidavits submitted by defendants in support of their motion to dismiss the antitrust claims.

■ Defendants say that plaintiffs' references, in briefs and argument, introduce a new factual allegation which can properly be asserted only in the form of a further amended complaint. But I do not think it is necessary to require plaintiffs to engage in further Rule 15 practice before the Court addresses the substantive issues involved. On a Rule 12(b)(6) motion, a complaint's factual allegations must be construed favorably to the plaintiff, and the description of collective conduct alleged in ¶ 47 is broad enough to em-

---

**5.** Whatever limitations on this principle may arise from § 402 of the Foreign Trade Antitrust Improvements Act of 1982 (FTAIA), 15 U.S.C. § 6a, do not apply to the case at bar, since the FTAIA specifically excludes from its coverage "import trade or import commerce."

brace the concept of the 15 cooperatives as Sherman Act § 1 co-conspirators.[6]

However, that conclusion on a point of procedure does not resolve the question of substance, which is whether the Board, MP Holdings, Western Dairy, *and the cooperatives* should be regarded as a single economic enterprise under the rationale of *Copperweld.*

The parties' research and that of the Court reveals three cases which consider cooperatives or trade associations in the context of antitrust single enterprise analysis. These are *Sunkist Growers, Inc. v. Winckler & Smith Citrus Products Co.,* 370 U.S. 19, 82 S.Ct. 1130, 8 L.Ed.2d 305 (1962); *United States v. Topco Associates, Inc.,* 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972); and *City of Mt. Pleasant, Iowa v. Associated Electric Cooperative, Inc.,* 838 F.2d 268 (8th Cir.1988), an Eighth Circuit opinion by Judge Arnold which discusses both *Sunkist* and *Topco.*

In *Sunkist,* 12,000 growers of citrus fruits in California and Arizona organized into local associations which operated packing houses. The associations in turn were grouped into district exchanges, and representatives from those exchanges made up the governing board of Sunkist, a nonstock membership corporation, which served the members as an organization for marketing their fresh produce, all its net revenues being distributed to the members. Subsequently, several member associations created a separate corporation to develop by-products for lemons in order to create a market for produce not salable as fresh fruit. 370 U.S. at 21, 82 S.Ct. at 1131–32.

These entities were sued for Sherman Act § 1 conspiracy and § 2 monopolization. The Court, reversing a jury verdict in plaintiffs' favor, held that these entities could not "be considered independent parties for the purposes of the conspiracy provisions of §§ 1

and 2 of the Sherman Act." *Id.* at 27, 82 S.Ct. at 1135. The Court reasoned that if the 12,000 growers had done no more than form a single collective association, the immunity from antitrust prosecution conferred by § 6 of the Clayton Act, 15 U.S.C. § 17, and § 1 of the Capper–Volstead Act, 7 U.S.C. § 291, would clearly apply. *Id.* at 27–29, 82 S.Ct. at 1134–1136. But plaintiffs argued that the growers' creation of several separate organizations, as described above, took the conduct of the growers and these entities out of the protection of the Clayton and Capper–Volstead Acts.

The Court disagreed, saying at 370 U.S. at 29, 82 S.Ct. at 1136:

... the 12,000 growers here involved are in practical effect and in the contemplation of the statutes one "organization" or "association" even though they have formally organized themselves into three separate legal entities. To hold otherwise would be to impose grave legal consequences upon organizational distinctions that are of *de minimis* meaning and effect to these growers who have banded together for processing and marketing purposes within the purview of the Clayton and Capper–Volstead Acts. There is no indication that the use of separate corporations had economic significance in itself or that outsiders considered and dealt with the three entities as independent organizations. That the packing is done by local associations, the advertising, sales, and traffic by divisions of the area association, and the processing by separate organizations does not in our opinion preclude these growers from being considered one organization or association for purpose of the Clayton and Capper–Volstead Acts.

In *Topco,* the Court considered an action for injunctive relief against Topco, a cooperative association of approximately 25 small

---

6. While the amended complaint does not name the cooperatives or make them parties defendant, that does not render the pleading defective. There is "no requirement that a plaintiff name ... all co-conspirators as long as their existence is set forth in the complaint." *Eye Encounter, Inc. v. Contour Art. Ltd.,* 81 F.R.D. 683, 689 (E.D.N.Y.1979). The pleading's reference to collective conduct on the part of New Zealand dairy farmers is sufficient to implicate the cooperatives, and of course defendants know who they are. *See also Volvo North America Corp.,* 857 F.2d at 71 (requisite plurality of conspirators sufficiently pleaded where named association consisted of multiple entities acting as joint venturers, although those entities were not named or made parties defendant).

and medium-sized regional supermarket chains operating stores in 33 states. Each of the member chains operated independently, without pooling of earnings, profits, capital, management, or advertising resources. Topco did not conduct grocery business under its own name. Its basic function was to serve as a purchasing agent for its members. 405 U.S. at 598, 92 S.Ct. at 1128–29. Over time, Topco "developed into a purchasing association wholly owned and operated by member chains, which possess much economic muscle, individually as well as cooperatively." *Id.* at 600, 92 S.Ct. at 1130.

The government charged Topco with violating § 1 of the Sherman Act by allocating marketing territories among its members. Clearly regarding the Topco members as competitors *inter se* and hence with interests diverse from the cooperative, the Court said that "[o]ne of the classic examples of a *per se* violation of § 1 is an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition.... We think that it is clear that the restraint in this case is a horizontal one, and, therefore, a *per se* violation of § 1." 405 U.S. at 608, 92 S.Ct. at 1133.

Analyzing *Topco* in *Mt. Pleasant*, Judge Arnold observed that while the fact that "Topco's members had interests diverse from the cooperatives was not made explicit in the Court's opinion, it was in the District Court's findings of fact in that case." 838 F.2d at 276 n. 6. The District Court in *Topco* found, *inter alia*, that "there have been a number of instances where Topco members have expanded into new territories without using Topco-branded products, including areas already licensed to another Topco member." *United States v. Topco Associates, Inc.*, 319 F.Supp. 1031, 1037 (N.D.Ill.1970).

In *Mt. Pleasant*, the defendants charged with being Sherman Act § 1 conspirators were separate corporations comprising part of a rural electric cooperative organized in Missouri and Iowa. The Court of Appeals' opinion describes the structure of the cooperative as follows:

This organization has three tiers. At the top of the organizational chart is Associat-

ed Electric Cooperative, Inc., which owns all but a fraction of the cooperative's electrical-generating capacity, and all of the larger power lines in the cooperative's transmission grid; it controls all of the production and distribution of electricity for the organization. J.A. 197–200. At the next level are six generation-and-transmission cooperatives (G & Ts), including defendants Central Electric Power Cooperative and Northeast Missouri Electric Power Cooperative, each of which owns a portion of the transmission grid, and which are responsible for transporting and selling wholesale electricity. *Id.* The third tier contains 43 local retain-distribution cooperatives, which buy wholesale power from the G & Ts and sell it to the cooperative's consumer-members in their service areas. *Id.*

838 F.2d at 271.

Plaintiff City of Mt. Pleasant owned an electric utility that sold electricity at retail to industrial, commercial and residential customers. The city found it less expensive to buy electricity wholesale from other utilities rather than produce its own, and accordingly entered into purchase agreements with the cooperative. Thereafter the city brought an antitrust action against certain of the entities involved in the cooperative structure previously described, alleging *inter alia* that these defendants "participated in a price-squeeze conspiracy" in violation of § 1 of the Sherman Act. 838 F.2d at 270. Upon completion of discovery, defendants moved for summary judgment. The District Court dismissed the § 1 claim on the authority of *Copperweld*. The Eighth Circuit affirmed.

Judge Arnold's opinion summarizes *Copperweld* as holding "that economic reality, not corporate form, should control the decision of whether related entities can conspire," and expresses the view that the *Copperweld* Court's "approving citation" of *Sunkist* "illustrates the point." 838 F.2d at 275. In *Mt. Pleasant* the Eighth Circuit went on to say of *Sunkist:*

It is true that *Sunkist* was decided under statutes granting immunity from antitrust liability, but we see no reason why, in the absence of a statutory immunity, similar

considerations should not guide the determination of whether related entities are a single enterprise for purposes of the conspiracy statute. In either case, a holding that the separate cooporatives are of separate organizations or can conspire together would "impose grave legal consequences upon organizational distinctions that are of *de minimis* meaning and effect." *Id.*

The *Mt. Pleasant* court distinguished *Topco* in these words:

> The critical distinction between this case and *Topco* is that here there is no evidence that any defendant ever pursued interests antithetical to those of the cooperative as a whole, while in *Topco* the members were actual or potential competitors of each other, and therefore had pursued interests antithetical to the Association's.

838 F.2d at 276. The court held that the record developed on discovery "bears out defendants' claim that the cooperative organization is a single enterprise pursuing a common goal—the provision of low-cost electricity to its rural consumer-members." That holding placed the burden on plaintiff city, resisting summary judgment, to show specific facts presenting a triable issue "as to whether any of the defendants has pursued interests diverse from those of the cooperative itself," a concept which the court defined as interests "which tend to show that any two of the defendants are, or have been, actual or potential conspirators, ... or, at the very least, interests which are sufficiently divergent so that a reasonable juror could conclude that the entities have not always worked together for a common cause." 838 F.2d at 276. The Eighth Circuit concluded its analysis by returning to *Copperweld:*

> In the language of *Copperweld,* the City must show facts that could lead a reasonable juror to find the coordination between any two defendants to be a "joining of two independent sources of economic power previously pursuing separate interests." 467 U.S. at 771, 104 S.Ct. at 2741.

*Id.*

The city argued that the record contained such evidence, but the Court of Appeals re-

jected the effort, concluding that *au fond* "[the cooperatives'] power depends, and has always depended, on the cooperation among themselves. They are interdependent, not independent." 838 F.2d at 277.

In these circumstances, the plaintiff in *Mt. Pleasant* failed to demonstrate the requisite plurality of conspirators, and defendants obtained summary judgment dismissing the § 1 claim.

So far as the research efforts of counsel and my own reveal, the Second Circuit does not appear to have considered the antitrust implications of cooperatives of thousands of citrus growers or associations of rural producers of electricity. Perhaps the demographics of the states of New York, Connecticut and Vermont explain why that is so. But I find Judge Arnold's analysis in *Mt. Pleasant* persuasive, and will apply it to the case at bar.

 It follows that the requisite plurality of § 1 conspirators does not exist in this case unless the 15 New Zealand dairy cooperatives or the dairy farmers who make up those cooperatives pursued "diverse interests," as that phrase is defined in *Mt. Pleasant.*

While the present record makes that appear unlikely, the question is not appropriate for resolution on a motion to dismiss under Rule 12(b)(6). It is important to recall that *Sunkist* and *Topco* were decided after plenary trials, and *Mt. Pleasant* on a motion for summary judgment after full discovery. Discovery in the instant case has been stayed; and it is not clear that no relief could be granted on this claim under any set of facts that could be proved consistent with the amended complaint's allegations, that being the touchstone of Rule 12(b)(6) practice.

 Accordingly defendants' motion to dismiss plaintiff's Sherman Act § 1 claim is denied. Defendants may, if so advised, move for summary judgment on the claim after the pertinent facts have been developed by discovery.[7]

---

**7.** Defendants' brief also challenges the sufficiency of plaintiff's Sherman Act § 1 claim for failing to allege the relevant market or the factors in-

volved in rule of reason analysis. But the amended complaint clearly alleges a horizontal price-fixing conspiracy which, if proved, consti-

B

■ Plaintiff's fifth claim alleges that defendants violated § 2 of the Sherman Act, 15 U.S.C. § 2, which condemns the conduct of "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations ..."

If plaintiff's § 2 claim was limited to an alleged conspiracy to monopolize, the plurality of conspirators requirement present in the § 1 claim would also apply, and I would approach the issue in the same way. But "the conduct of a single firm" may violate § 2, if that conduct "pose[s] a danger of monopolization." *Copperweld*, 467 U.S. at 767–68, 104 S.Ct. at 2739–40. "Monopolization without conspiracy is unlawful under § 2, but restraint of trade without a conspiracy or combination is not unlawful under § 1." *Id.* at 767 n. 13, 104 S.Ct. at 2740 n. 13.

■ "The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 481, 112 S.Ct. 2072, 2089, 119 L.Ed.2d 265 (1992) (citing and quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966)). The present question is whether plaintiffs' amended complaint, evaluated by the criteria governing Rule 12(b)(6) practice, sufficiently alleges these elements against defendants.

As plaintiffs acknowledge in their brief at 30, § 2 requires them "to allege the existence of monopoly power in a relevant market." Plaintiffs say they have done so. Specifically, the amended complaint alleges that "the defendants and their co-conspirators[8] have ... created an export cartel in New Zealand" giving them "a monopoly of the exportation of New Zealand dairy products, including cheese, to the United States," ¶ 56(a), and "created a price squeeze by establishing export prices for New Zealand cheese that enable NZDB and the co-conspirator manufacturers to earn monopolistic profits while limiting the ability of the plaintiffs and other competitors of Western Dairy to purchase and resell New Zealand cheese on a profitable basis," ¶ 56(d).

While the amended complaint contains other charges, I think that these are sufficient to describe anticompetitive activities implicating § 2 of the Sherman Act, assuming that plaintiffs have adequately identified the relevant market. "It is, of course, a basic principle in the law of monopolization that the first step in a court's analysis must be a definition of the relevant markets." *Berkey Photo., Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 268 (2d Cir.1979), *cert. denied*, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980).

Market analysis turns upon the identity of and options available to the consumers whose interests the antitrust laws are intended to protect. The amended complaint alleges that defendants acted with the intent "of monopolizing the market for the importation, distribution, and sale in the United States of New Zealand cheese." ¶ 57. In plaintiff's view, the competitors in that market are those American commercial entities holding USDA-granted quota licenses for the importation of New Zealand cheese, including plaintiffs and Western Dairy. Plaintiffs contend that "for United States customers desiring to use their New Zealand import licenses, no other products are interchangeable with New Zealand cheese." Brief at 37. That

---

tutes a *per se* violation; to sustain that claim, plaintiffs need not plead or prove a relevant market, 7 Areeda, *Antitrust* § 1510 at 415, nor demonstrate that defendants' conduct was economically reasonable, *Topco*, 405 U.S. at 608–12, 92 S.Ct. at 1133–36; *United States v. Trenton Potteries Co.*, 273 U.S. 392, 397–98, 47 S.Ct. 377, 379–80, 71 L.Ed. 700 (1927).

8. I construe the phrase "co-conspirators" to mean the 15 dairy cooperatives. Even if the named defendants and the cooperatives should be regarded as a single economic entity so that they could not conspire together, *see* discussion under Point III–A *supra*, their joint conduct may constitute the possession and exercise of monopoly power in violation of § 2 of the Sherman Act.

brings the case at bar, plaintiffs contend, squarely within the ruling of *Eastman Kodak Co. v. Image Technical Services, Inc.*, where the Court said that "[b]ecause service and parts for Kodak equipment are not interchangeable with other manufacturers' service and parts, the relevant market from the Kodak equipment owner's perspective is composed *only* of those companies that service Kodak machines." 504 U.S. at 482, 112 S.Ct. at 2090 (emphasis added).

■ Defendants say that the United States' statutory and regulatory scheme limiting the importation of cheese "precludes the existence of any economically viable 'market' for cheese imports from any particular country, let alone from New Zealand." Reply Brief at 39. I am unable to perceive the basis for that conclusion. It is quite true that the statutory and regulatory quota and licensing scheme limits (a) the amount of cheese that can be imported from New Zealand, and (b) the number of authorized importers. In short, the licensed New Zealand cheese importers' non-interchangeable New Zealand cheese market is a creation of American law. But that does not prevent an identifiable market from being a market. Markets come into being as the result of a broad spectrum of human behavior. Here, that behavior takes the form of governmental action; but I think that the genesis of the market is not so important as the conduct of the market players. "Industrial activities cannot be confined to trim categories. Illegal monopolies under § 2 may well exist over limited products in narrow fields where competition is eliminated." *United States v. du Pont & Co.*, 351 U.S. 377, 395, 76 S.Ct. 994, 1007, 100 L.Ed. 1264 (1956).

I agree with plaintiffs at bar that New Zealand cheese imported into the United States is the relevant market for § 2 analysis, and that *Eastman Kodak* supports their position. For the quota-licensed New Zealand cheese importer, desirous of deriving maximum profit from its license, New Zealand cheese is no more interchangeable with other cheeses than were non-Kodak parts for servicers of Kodak equipment. Defendants' reliance upon the regulations, 7 CFR § 6.30, is misplaced. That section provides only that

if a licensee submits "proof satisfactory to the Licensing Authority that said licensee will be unable to enter during a quota year his or her quota share of an article from the country of origin specified in his or her license," application may be made "to obtain the unfilled portion of their quota shares" from another country. The regulation focuses upon supply, not upon price, and is not implicated in the case at bar. Plaintiffs are quite prepared to enter their full quota shares of New Zealand cheese; but they complain of defendants' allegedly monopolistic practices in respect of the price they must pay for it.

Defendants profess to find comfort in *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993), but I do not think the case assists them. In *Spectrum* the Ninth Circuit affirmed a judgment in plaintiff's favor after jury trial, on the theory that the evidence supported a finding of attempt to monopolize in violation of § 2. The Supreme Court reversed, holding that the defendants "may not be liable for attempted monopolization under § 2 of the Sherman Act absent proof of a dangerous probability that they would monopolize a particular market and specific intent to monopolize." 506 U.S. at 459, 113 S.Ct. at 892. Plaintiffs' verdict in *Spectrum* could not stand because the trial court's instructions, contrary to those principles, "allowed the jury to infer specific intent and dangerous probability of success from the defendants' predatory conduct, without any proof of the relevant market or of a realistic probability that the defendants could achieve monopoly power in that market." *Id.* In the case at bar, the amended complaint sufficiently alleges the existence of the relevant market, and conduct by defendants that not only could achieve monopoly power in that market, but in fact has done so.

For these reasons, I conclude that the present plaintiffs' Sherman Act § 2 claim survives Rule 12(b)(6) challenge, and deny defendants' motion to dismiss the claim.

## IV

■ Plaintiffs' third claim is for common law fraud. The following allegations in the

amended complaint are pertinent to that claim.

For many years the NZDB has followed the practice of sending written communications of all holders of New Zealand cheese licenses offering to sell cheese against the licensees' annual entitlement. These offers are made in the name of Western Dairy, acting as agent for NZDB, and are sent to the licensees shortly before the start of the calendar year. Amended complaint, ¶ 16.

Consistent with that practice, the Board and Western Dairy made their annual offer for New Zealand's 1993 cheese quotas by a letter dated December 30, 1992, which set forth the conditions of sale "and invited orders for New Zealand cheese against 1993 license entitlement through May 31, 1993." The prices quoted by Western Dairy to the licensees were 6 cents and 8 cents "below the Green Bay Cheese Exchange quotes in effect on the Friday before preparation of entry documents for the cheese. The only condition placed on the offer was '[s]ubject to availability.'" *Id.* ¶ 17. Plaintiffs, as New Zealand cheese licensees, received that communication from Western Dairy and shortly thereafter responded to it. Specifically, Mel Persily, a representative of plaintiffs, telephoned Western Dairy and accepted the latter's offer for "large orders" of New Zealand cheese "to be delivered in January and February of 1993. A Western Dairy employee then falsely informed Persily that no cheese was available for delivery at the time specified by Persily." *Id.* ¶ 19.

*Faut de mieux* and "under protest," Persily then placed orders with Western Dairy on behalf of plaintiffs for delivery of New Zealand Cheese by vessels scheduled to arrive in the United States in mid-May, "the earliest time when the Western employee represented that cheese would be available." Plaintiffs were compelled to place that order because they had "purchased sufficient inventory to meet orders taken and to be taken from domestic customers of plaintiff." *Id.* ¶ 20. But as the result of a sharp increase in the exchange quotes between late February and late May, alleged in ¶ 23 of the amended complaint, plaintiffs were eventually billed for the cheese they received on the basis of the April 30, 1993 Exchange quote. This caused plaintiffs to pay more for the cheese than they would have if defendants had delivered the cheese earlier, in response to plaintiff's acceptance of Western Dairy's offer to sell.

Plaintiffs characterize defendants' conduct as fraudulent, resulting in the economic loss described above.

These are well-pleaded factual allegations. I accept them as true within the Rule 12(b)(6) context.

Defendants make two arguments in support of their motion to dismiss this claim. First, defendants say that these allegations show no more than defendants' refusal to deal with plaintiffs at the time plaintiffs wished to do so, and that a refusal to deal cannot constitute fraud as a matter of law. Second, and in the alternative, defendants contend that plaintiffs have not pleaded fraud with the specificity required by Rule 9(b), F.R.Civ.P.

### A

In support of their "refusal to deal" contention, defendants cite three cases whose facts bear no useful resemblance to the facts alleged in the amended complaint.

I do not think that those allegations spell out a refusal by defendants to deal with plaintiffs. On the contrary, defendants followed the practice of prior years and offered to deal with plaintiffs by selling New Zealand cheese to them. Plaintiffs accepted that offer and requested delivery in early 1993. The amended complaint alleges not a refusal to deal on the part of defendants, but rather the defendants' fraudulent protestation of an inability to deal at the time plaintiffs requested. That protestation of inability to deal was fraudulent because, accepting the truth of plaintiffs' allegations, New Zealand cheese was available to defendants for delivery to plaintiffs in early 1993, and a Western Dairy employee lied when he told plaintiffs' representative that no cheese was then available, and would not be until several months later.

This alleged conduct, if proven, is certainly commercially dishonorable; and it comes with ill grace from defendants to contend

that it cannot be characterized in law as fraudulent.

■ I think that the amended complaint sufficiently pleads an action for fraud, which "requires proof of a representation of fact which is false and known to be false when made, which is offered to deceive another and with the intention to induce the other to act or refrain from acting, and proof of reliance upon the representation which causes injury." *Chase Manhattan Bank, N.A. v. Perla,* 65 A.D.2d 207, 411 N.Y.S.2d 66, 68 (4th Dept.1978).

Plaintiffs at bar sufficiently allege these elements. The amended complaint alleges that a Western Dairy representative falsely told plaintiffs that there was no New Zealand cheese then available for delivery when in fact he knew that there was. It is hard to imagine why the Western Dairy representative lied to plaintiffs' representative unless he intended to deceive plaintiff. The deceiver's intention was apparently to persuade plaintiffs to accept a later delivery of cheese. Plaintiffs relied upon Western Dairy's disclaimer of present cheese availability and, confronted with their own economic necessities, agreed to accept delivery at a later time, thereby subjecting themselves to market volatility which in fact caused them monetary loss. If (accepting the accuracy of plaintiffs' allegations as I must) the Western Dairy representative had told plaintiffs' representative the truth in early January 1993—that defendants had plenty of cheese available but had decided not to fill plaintiffs' order— plaintiffs could have sought administrative relief, or declaratory or injunctive relief from a court in the form of an order to show cause.

I conclude that the amended complaint alleges conduct on the part of defendants which, if proved, would constitute fraud as a matter of law.

### B

■ Rule 9(b) provides: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Rule 9(b) must be read together with Rule 8(a) which requires only a "short and plain statement" of the claims for relief." *Ouaknine v. MacFarlane,* 897 F.2d 75, 79 (2d Cir.1990); *DiVittorio v. Equidyne Extractive Industries, Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987). On a motion to dismiss, the court assumes the truth of plaintiff's factual allegations, *Ouaknine* at 78, reads the complaint generously, and draws all inferences in favor of the pleader. *Cosmos v. Hassett,* 886 F.2d 8, 11 (2d Cir.1989); *Yoder v. Orthomolecular Nutrition Institute, Inc.,* 751 F.2d 555, 562 (2d Cir.1985). But Rule 9(b) must be enforced so as to accomplish its three goals: (1) providing a defendant fair notice of plaintiff's claim, to enable preparation of his defense; (2) protecting a defendant from harm to his reputation or goodwill; and (3) reducing the number of strike suits. *O'Brien v. National Property Analysts Partners,* 936 F.2d 674, 676 (2d Cir.1991); *DiVittorio* at 1247.

■ To satisfy the particularity requirement of Rule 9(b), a complaint must adequately specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiff contends the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements. *Cosmas* at 11. Where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud. *DiVittorio* at 1247. However, no specific connection between fraudulent representations or omissions need be pleaded as to defendants who are insiders or affiliates personally participating in the statements at issue. *DiVittorio* at 1247 (offering memorandum); *Luce v. Edelstein,* 802 F.2d 49, 55 (2d Cir.1986) (same).

■ A complaint may adequately identify the statements alleged to be misrepresentations and properly indicate when, where and by whom they were made, yet still fail Rule 9(b) scrutiny if the complaint does not allege circumstances giving rise to a strong inference that defendant knew the statements to be false, *Wexner v. First Manhattan Co.,* 902 F.2d 169, 173 (2d Cir.1990), and intended to

defraud plaintiff, *Ouaknine* at 80; *Beck v. Manufacturers Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir.1987), *cert. denied*, 484 U.S. 1005, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988).

Knowledge is a state of mind. So is intent to defraud, or "scienter." While Rule 9(b) permits conditions of mind to be averred generally, the rule also requires that allegations of scienter be supported by facts giving rise to a "strong inference" of fraudulent intent. *Ouaknine* at 80; *Beck* at 50; *Connecticut National Bank v. Fluor Corp.*, 808 F.2d 957, 962 (2d Cir.1987).

■ Knowledge of falsity cannot be alleged in conclusory terms. Plaintiff must be able to allege particulars regarding a defendant's awareness or discovery of the facts upon which plaintiff relies for the claim of fraud. *O'Brien* at 677.

Allegations supporting an inference of fraudulent intent frequently include defendant's statement that a fact exists or an event will come to pass coupled with allegations that the fact did not exist or the event did not occur, and circumstances indicating that the statement was false when made. *See, e.g., Luce* at 56 (alleged misrepresentation in offering memorandum that general partners would make an initial capital contribution of $385,000 and guarantee a $4.5 million construction loan accompanied by allegations that general partners contributed only $80,000 and did not guarantee the loan); *DiVittorio* at 1248 (offering memorandum's statement that proceeds of offering would be expended as quickly as possible accompanied by allegation that proceeds were never so applied, and estimate that property contained approximately 9,260,000 tons of coal accompanied by allegation that mines did not contain nearly that much). *See Ouaknine* at 81 for a comparable analysis.

■ To satisfy the scienter requirement, a plaintiff need not allege facts which show a defendant had a motive for committing fraud, so long as plaintiff adequately identifies circumstances indicating "conscious behavior" by the defendant from which an intent to defraud may fairly be inferred. *Cosmas* at 13. However, where a particular defendant's motive to defraud is not apparent, the strength of the circumstantial allegations must be correspondingly greater. *Beck* at 50.

Allegations may be based on information and belief when facts are peculiarly within the opposing party's knowledge. *Luce* at 54 n. 1; *DiVittorio* at 1247–48. However, that exception to Rule 9(b)'s general requirement of particularized pleading does not constitute a license to base claims of fraud on speculation or conclusory allegations. Where pleading is permitted on information and belief, a complaint must adduce specific facts supporting a strong inference of fraud or it will not satisfy a relaxed pleading standard. *Wexner* at 172.

Applying these principles to the case at bar, I conclude that the amended complaint complies with the requirements of Rule 9(b). While plaintiffs do not identify the allegedly mendacious Western Dairy employee by name, the identity of the representative speaking with plaintiffs' Mr. Persily is peculiarly within Western Dairy's knowledge. The circumstances giving rise to an inference of fraudulent intent are sufficiently pleaded in ¶ 27 of the amended complaint, which alleges:

> Further investigation revealed to Trugman and Trio that Western had itself taken delivery of huge shipments of cheese from NZDB for its own account during the very periods for which Western had falsely represented that no cheese was available. Upon information and belief, even after Western took delivery of its cheese, there was still cheese available to fulfill Trugman's and Trio's orders for early 1993 arrival.

■ The other pleading requirements are also fulfilled. Given Western Dairy's alleged role as agent for the NZDB, the amended complaint adequately alleges claims for fraud against the Board and MP Holdings, since a principal is liable for the fraudulent acts of its agent committed within the scope of the agent's authority. *Chase Manhattan Bank, N.A. v. Perla, supra*, 411 N.Y.S.2d at 69.

Defendant's motion to dismiss plaintiff's third claim for common law fraud is denied.

## V

Defendants also move to dismiss plaintiffs' claim for punitive damages. I deny that motion. Under New York law, punitive damages may be awarded for "gross, wanton, or willful fraud or other morally culpable conduct," *Borkowski v. Borkowski*, 39 N.Y.2d, 982, 983, 387 N.Y.S.2d 233, 355 N.E.2d 287 (Ct.App.1976). Given the allegations of the amended complaint with respect to defendants' fraudulent conduct, I am not prepared to say that they cannot prove circumstances that would justify an award of punitive damages.

Lastly, Western Dairy as plaintiff in 93 Civ. 8329 moves for partial summary judgment in the amount of $1,873,505.64, an amount that, in Western Dairy's view, "Trugman concedes it owes [Western Dairy] for the cheese." Defendants' main brief at 55. However, defendants face the possibility—prior to discovery and trial, I put it no higher than that—of significant liability which would exceed this amount. In those circumstances, I do not think that defendants can establish a present right to partial summary judgment for the amount indicated. The net obligations and rights of the parties must await resolution by trial.

For the foregoing reasons, the defendants' motions in 93 Civ. 8321 are denied in their entirety. Western Dairy's motion for partial summary judgment in 93 Civ. 8329 is denied. The stay of discovery is vacated. Counsel for the parties are directed to attend a status conference in Room 17C, 500 Pearl Street at 2:00 p.m. on October 18, 1996 for the purpose of settling an appropriate scheduling order.

It is SO ORDERED.